# EXHIBIT A

Andrew D. Wright, #8857
Andrew B. McDaniel, #11070
STRONG & HANNI
9350 South 150 East, Suite 820
Sandy, Utah 84070
Telephone: (801) 532-7080
Facsimile: (801) 323-2037
awright@strongandhanni.com
amcdaniel@strongandhanni.com
*Attorneys for Plaintiff*

---

### IN THE THIRD JUDICIAL DISTRICT COURT OF SALT LAKE COUNTY

### STATE OF UTAH

| | |
|---|---|
| PRIME INSURANCE COMPANY <br><br> Plaintiff, <br><br> v. <br><br> B & Y TRANSPORT LLC, BOBIRT R. MIRANDA, and ARIEL HERNANDEZ CORDOVA <br><br> Defendants. | **COMPLAINT FOR DECLARATORY RELIEF** <br><br> Case No: <br><br> Judge: <br><br> Tier 2 |

Plaintiff Prime Insurance Company ("Prime") hereby complains and alleges against Defendants B & Y Transport LLC ("B & Y"), Bobirt R. Miranda, and Ariel Hernandez Cordova as follows:

### **PARTIES**

1.      Prime is an insurance company incorporated under the laws of the State of Illinois, with its principal place of business in Utah.

2.     B & Y is a Tennessee company, with its principal place of business in La Vergne, Tennessee.

3.     Upon information and belief, Bobirt R. Miranda is a resident of the State of Tennessee.

4.     Upon information and belief, Defendant Ariel Hernandez Cordova is a resident of the State of Florida.

## JURISDICTION

5.     Jurisdiction and venue are proper in this Court and County pursuant to Utah Code Annotated Sections 78B-3-304, 78B-6-401, and 78B-3-307.

6.     Pursuant to Policy No. SC19020355, Plaintiff and Defendants have contractually agreed to submit to jurisdiction and venue in any Court within the State of Utah and have agreed that Utah law will be applied.

## TIER DESIGNATION

7.     Inasmuch as Plaintiff seeks declaratory relief, this case qualifies as Tier 2 for standard discovery purposes.

## GENERAL FACTUAL ALLEGATIONS

8.     Plaintiff incorporates each of the allegations set forth above as though fully set forth herein.

### A.  The Policy:

9.     Prime issued commercial auto and cargo coverage to B & Y Transport in the form of Policy No. SC19020355 with coverage effective dates of February 8, 2019 through February 8, 2020 (the "Policy").  (See Policy, Ex. 1.)

10.     The Policy contains several provisions that relate to the coverage issues in this case.

First, it sets forth the following relevant requirements with regard to coverage of a claim:

### COMMERCIAL BUSINESS AUTO INSURANCE POLICY

### PCA-00-08

**THIS COMMERCIAL BUSINESS AUTO INSURANCE POLICY (the "Policy") is a manuscript policy, meaning it is a negotiated agreement between the Named Insured and the Insurer, and as such it may differ significantly from liability policies offered by other insurance companies. This Policy contains very strict claim reporting requirements which must be followed as conditions precedent to coverage. The terms of this Policy are contractual and are not merely recitals and all information supplied by any Insured to obtain coverage, constitute warranties of the Insured to the Insurer.**

**Coverage is strictly limited to scheduled Autos operated by scheduled drivers and operations and at those locations listed, described, and defined herein. Various other provisions of this Policy restrict and limit the coverage provided. Please read the entire Policy and all the Endorsements carefully to determine your rights and duties and what is and is not covered.**

(See Policy, PCA-00-08, p. 1, Ex. 1.) (bold in the original).

11.     Next, the Policy includes the following additional information pertaining to coverage:

### SECTION I — LIABILITY COVERAGE

A.  Insuring Agreement

1.  Subject to all of the terms, limitations, conditions, definitions, exclusions, and other provisions of this Policy, we will pay Damages in excess of any SIR that you are legally obligated to pay because of Bodily Injury or Property Damage to which this Policy applies if caused by an Accident and resulting from the ownership, maintenance, or use of a Scheduled Auto as identified in the Policy, on the Declarations or any Endorsement if:

•  •  •

d.  The Scheduled Auto is being operated by a Scheduled Driver at the time of the Accident.

(See Policy, PCA-00-08, p. 1, Ex. 1.)

12.     The Policy also sets forth the following relevant Exclusion:

B. Liability Exclusions

In the event that any of the exclusions stated in this Policy are found by a court of law to be unenforceable or in contradiction to applicable law in regards to a specific Claim, the invalid provision is to be interpreted as providing the minimum insurance coverage required under the financial responsibilities laws, in place of the invalid exclusion, for such Claim.

This Policy does not cover, and we will not be obligated to defend you against or pay Damages on your behalf for any of the following:

. . .

15.     Bodily Injury or Property Damage arising out of the use, operation, or maintenance of a Scheduled Auto by anyone other than an Insured.

(See Policy, PCA-00-08, p. 5, Ex. 1.)

13.     The Policy explains as follows concerning who qualifies as an insured:

### SECTION III — WHO IS AN INSURED?

A.     The "Named Insured" is the person and/or entity expressly designated on the Declarations or in any Endorsement. If the person or entity designated as the Named Insured is:

. . .

B.     An "Insured" is also any Scheduled Driver of an otherwise Scheduled Auto who is maintaining or operating the Scheduled Auto for commercial business operations.

(See Policy, PCA-00-08, p. 11, Ex. 1.)

14.     The Policy also includes a Scheduled Drivers Endorsement that explains as follows:

### SCHEDULED DRIVERS AMENDMENT ENDORSEMENT

### PCA-99-40

**This Endorsement changes the terms and conditions of the Policy issued. Please read it carefully!**

No Coverage shall be provided under this Policy for any covered Auto which is being used or operated by anyone other than the driver(s) or operator(s) on file with Southern General Agency, Inc. The Insured hereby warrants that each and every person on this policy is over the age of 25 and under the age of 70, unless such driver has been reviewed and authorized by an underwriter and additional premium, if applicable, has been paid for such drivers.

All other terms, conditions and exclusions of the Policy remain in full force and effect.

(<u>See</u> Endorsement, PCA-99-40, p. 1, Ex. 1.)

      15.     In applying for the Policy, B & Y's owner, Bobirt Miranda, signed a Personal

Guarantee and Indemnity Agreement that included the following language, in relevant part:

<b>PERSONAL GUARANTEE AND INDEMNITY AGREEMENT</b>

I, the undersigned, in my individual capacity, hereby enter into this Personal Guarantee and Indemnity Agreement ("Agreement") which is effective as of the date indicated below and which shall continue in force until such time as it is mutually cancelled with the written approval of the Insurer.

I hereby agree to personally indemnify and hold the Insurer harmless from any and all costs, attorneys fees, expenses, settlement proceeds, or other funds expended or deemed owing as a result of the following:

. . .

(3)     Any claim involving a driver who was not properly scheduled on the Policy for which claim the Insurer is nevertheless required to make any payment as a result of any federal or state financial responsibility filing, including without limitation, any MCS-90, Form E or similar undertaking.

(<u>See</u> Personal Guarantee, Ex. 2.)

      16.     At the time it issued the Policy, Prime also issued an MCS-90 Form in compliance

with federal regulations. That Form states as follows, in relevant part:

**MCS-90 ENDORSEMENT**

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

(See MCS-90 Endorsement, p. 2, Ex. 3.)

### **B. The May 4, 2019 Accident:**

17. On May 4, 2019, Mr. Cordova was driving a 2012 International Tractor, VIN - 13536 on behalf of B & Y when the vehicle blew a tire.

18. As a result of the blown tire, Mr. Cordova ultimately lost control of his truck and collided with another vehicle driven by Jose Luis Rodriguez Gutierrez.

**C. The Insurance Claims:**

19.     Mr. Gutierrez seeks to recover for personal injuries and property damage he claims to have sustained as a result of the May 4, 2019 accident and has filed suit against B & Y and Mr. Cordova in Florida state court.

20.     An environmental cleanup claim has also been asserted by Incident Management Solutions, LLC due to leaked diesel.

21.     Furthermore, B & Y incurred costs for the removal and storage of its trailer involved in the above accident, along with associated cleanup costs.

22.     After investigating the above claims, Prime informed B & Y there was no coverage available under the terms of the Policy for those claims, for the reasons set forth below. Pursuant to that correspondence, Prime also reserved all rights under the law and under the Policy. (See July 29, 2019 Letter and September 19, 2019 Letter, Ex. 4.)

23.     Prime is defending the Defendants in the Gutierrez lawsuit, subject to the reservation of rights set forth in the July 29, 2019 letter.

## CLAIMS FOR DECLARATORY RELIEF

24.     Plaintiff incorporates each of the allegations set forth above as though fully set forth herein.

25.     An actual dispute and controversy has arisen between Plaintiff and Defendants regarding whether there is coverage under the Policy for the claims arising out of the May 4, 2019 accident.

26.     There is no coverage under the Policy for those claims because Mr. Cordova was not a scheduled driver.

27. As set forth above, the Policy's insuring language establishes that coverage is limited to claims involving vehicles that are "being operated by a Scheduled Driver at the time of the Accident."

28. Furthermore, Exclusion 15 specifically excludes coverage for bodily injury or property damage "arising out of the use, operation, or maintenance of a Scheduled Auto by anyone other than an Insured."

29. The Policy explains an "Insured" includes a named insured as well as a "Scheduled Driver . . ."

30. The Scheduled Drivers Amendment Endorsement then establishes that scheduled drivers are limited to "driver(s) or operator(s) on file with Southern General Agency, Inc.", and that coverage is precluded for all other drivers.

31. Mr. Cordova, the driver involved in the May 4, 2019 accident, was not on file with Southern General Agency, Inc. at the time of that accident. Accordingly, he does not qualify as a scheduled driver and coverage is precluded on that basis.

32. Inasmuch as there is no coverage under the terms of the Policy, Prime is entitled to reimbursement from B & Y for any payments it makes or costs it incurs arising out of the May 4, 2019 accident.

33. The MCS-90 Form explains that "all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company."

34.     Moreover, pursuant to the MCS-90 Form, B & Y agreed to reimburse Prime for any payment Prime "would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement."

35.     Therefore, in the event Prime is required to make any payments under the MCS-90 Form arising out of the May 4, 2019 accident, B & Y is obligated to reimburse Prime for those payments inasmuch as there is no coverage under the terms of the Policy.

36.     Furthermore, in obtaining the Policy Mr. Miranda signed a Personal Guarantee and Indemnity Agreement.

37.     Pursuant to that agreement, Mr. Miranda agreed, in his individual capacity, to personally indemnify and hold Prime harmless from any costs, attorneys fees, expenses, and other amounts it incurs as a result of any claim involving a driver who was not properly scheduled under the Policy, for which Prime is nevertheless required to make payment due to a financial responsibility filing, including an MCS-90 filing.

38.     Accordingly, in the event Prime is required to make any payments under the MCS-90 Form arising out of the May 4, 2019 accident, Mr. Miranda personally has an obligation to reimburse Prime for those payments.

39.     Based on the foregoing, a judicial determination is necessary and appropriate at this time to determine the respective rights of Plaintiff and Defendants under the Policy.

40.     Pursuant to Utah Code Ann. §78B-6-408, Plaintiff requests a declaration from this Court that:

(a)     There is no coverage under the terms of the Policy for the claims arising out of the May 4, 2019 accident inasmuch as that accident involved an unscheduled driver.

(b)    As coverage is precluded, Prime has no obligation to defend or indemnify Defendants under the terms of the Policy for any claims arising out of the May 4, 2019 accident.

(c)    As coverage is precluded, Defendants have no right of recovery against Prime under the terms of the Policy for any claims arising out of the May 4, 2019 accident.

(d)    In the event Prime is required to make any payments for the claims arising out of the May 4, 2019 accident pursuant to the MCS-90 Form, B & Y is obligated to reimburse Prime for those payments inasmuch as there is no coverage under the terms of the Policy.

(e)    In the event Prime is required to make any payments for the claims arising out of the May 4, 2019 accident pursuant to the MCS-90 Form, Bobirt R. Miranda is personally obligated to indemnify Prime for those payments.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Prime prays for the following relief:

1.    For a declaration that:

(a)    There is no coverage under the terms of the Policy for the claims arising out of the May 4, 2019 accident inasmuch as that accident involved an unscheduled driver.

(b)    As coverage is precluded, Prime has no obligation to defend or indemnify Defendants under the terms of the Policy for any claims arising out of the May 4, 2019 accident.

(c)    As coverage is precluded, Defendants have no right of recovery against Prime under the terms of the Policy for any claims arising out of the May 4, 2019 accident.

(d)     In the event Prime is required to make any payments for the claims arising out of the May 4, 2019 accident pursuant to the MCS-90 Form, B & Y is obligated to reimburse Prime for those payments inasmuch as there is no coverage under the terms of the Policy.

(e)     In the event Prime is required to make any payments for the claims arising out of the May 4, 2019 accident pursuant to the MCS-90 Form, Bobirt R. Miranda is personally obligated to indemnify Prime for those payments.

(f)     In light of its obligations under the MCS-90 Form, Prime is entitled to reasonably resolve the pending claims made against Defendants.

2.     For costs incurred herein; and

3.     For such other and further relief as the Court deems just and proper.

DATED this 20th day of September, 2019.

STRONG & HANNI

By     /S/ Andrew B. McDaniel
         Andrew D. Wright
         Andrew B. McDaniel
         *Attorneys for Plaintiffs*

Plaintiff's address:
PRIME INSURANCE COMPANY
c/o CLAIMS DIRECT ACCESS
8722 South 300 West
PO Box 4439
Sandy, Utah

Exhibit 1



# Prime Insurance Company
## Declarations

THIS INSURANCE POLICY (the "Policy") is being issued by an Insurer that may not be licensed by the state insurance department in this state and may not be subject to this state's supervision and may not be protected in the event of the insolvency of the insurer by this state's guaranty or security fund. This Policy issued may not be subject to any or all of the regulations of this state's insurance department pertaining to Policy form.

| | | |
|---|---|---|
| **Policy Number:** SC19020355 | **Customer Number:** | C19-102252 |

**Policy Period:**   From Effective Date:  2/8/2019   To Expiration Date:  2/8/2020   Retroactive Date:  2/8/2019
(All dates (12:01 a.m.) of the physical address of the Insured.)

**Name and Physical Address of the Insured:**
B & Y Transport LLC

1512 Waxman Dr
La Vergne, TN 37086

**Mailing Address:**
Same

**Policy Premium:**

| | |
|---|---|
| Premium: | $58,964.00 |
| Insurer Inspection/Policy Fee: | $250.00 |
| Surplus Lines Broker Fee | $750.00 |
| State Tax: | $2,998.20 |
| SLSC: | $104.94 |
| | |
| **Total:** | **$63,067.14** |

25 % Premium Earned at Inception

**Description of coverage afforded hereunder:**    Commercial Auto Liability including Motor Truck Cargo -- Southern General - Prime Elite

**Endorsements and forms afforded to this policy:**    PAP-99-06, PCA-99-07, PCA-00-08, PCA-99-17, PCA-99-39, PCA-99-40, PIM-11-01, PMT-12-05, PMT-99-02 CA 2120 1013, MCS-90, PAP-99-07, PAP-99-37

**Producer:**  Southern General Agency, Inc.
  PO Box 12480                          Contact: Stephen Allen Nafe
  Alexandria, LA 71315                  License No: 771264

**Issuing Office:**  Prime Insurance Company
  8722 S. Harrison St.
  Sandy, UT 84070

**Address Notice of Claims to:**  Claims Direct Access (CDA)
  8722 S. Harrison St.
  Sandy, UT 84070



# Prime Insurance Company
## Declarations
### Page 2 of 2

| Commercial Auto: | | Line Premium: $51,132 | |
|---|---|---|---|
| $1,000,000 | Per Accident | $65,000 | UM Per Accident |
| $5,000 | Property Damage Clean Up Cost Sublimit | $10,000 | Towing and Storage |
| $1,000 | SIR-BI | | |
| $1,000 | SIR-PD | | |
| $2,500 | Physical Damage Deductible | | |

Number of Vehicles: 4

| $31,000 Physical Damage-total scheduled value | Line Premium: $2,232 |
|---|---|

| Motor Truck Cargo | | | | | Line Premium: $5,600 |
|---|---|---|---|---|---|
| Cargo | Units: | 4 | Value: | $100,000 | 0 |
| Deductible: | $1,000 | | | | |

| Insured Name: | B & Y Transport LLC | |
|---|---|---|
| Issuing Date: | 2/14/2019 | Authorized Representative |

"This insurance policy is being issued by an insurer that may not be licensed by the state insurance department in this state and may not be subject to this state's supervision and may not be protected in the event of the insolvency of the insurer by this state's guaranty or security fund. This policy issued may not be subject to any or all of the regulations of this state's insurance department pertaining to policy form."

**THIS INSURANCE CONTRACT IS REGISTERED AND DELIVERED AS A SURPLUS LINES POLICY UNDER THE SURPLUS LINE LAWS IN THE STATE WHERE THE NAMED INSURED IS LOCATED. THE INSURANCE IS NOT ISSUED BY AN INSURANCE COMPANY REGULATED BY THE STATE WHERE THE INSURANCE IS ISSUED AND IS NOT PROTECTED BY ANY STATE INSURANCE GUARANTEE FUND.**

# COMMERCIAL BUSINESS AUTO INSURANCE POLICY

## PCA-00-08

THIS COMMERCIAL BUSINESS AUTO INSURANCE POLICY (the "Policy") is a manuscript policy, meaning it is a negotiated agreement between the Named Insured and the Insurer, and as such it may differ significantly from liability policies offered by other insurance companies. This Policy contains very strict claim reporting requirements which must be followed as conditions precedent to coverage. The terms of this Policy are contractual and are not merely recitals and all information supplied by any insured to obtain coverage, constitute warranties of the Insured to the Insurer.

Coverage is strictly limited to scheduled Autos operated by scheduled drivers and operations and at those locations listed, described, and defined herein. Various other provisions of this Policy restrict and limit the coverage provided. Please read the entire Policy and all Endorsements carefully to determine your rights and duties and what is and is not covered.

Claim Expenses reduce the available Limits of Liability stated on the Declarations. In the event of any Claim, the total amount of any Policy premium charged is 100% earned and not subject to short-rate or pro-rata adjustment.

Throughout the Policy and any Endorsements, the words "you," "your," and "insured" refer to the insured and Named Insured. The term "Named Insured" refers only to the Named Insured. The words "we," "us," "our," and the "Company" refer to the Insurer.

Capitalized terms have specific meaning throughout the Policy as defined herein.

## SECTION I — LIABILITY COVERAGE

A.  Insuring Agreement

1.  Subject to all of the terms, limitations, conditions, definitions, exclusions, and other provisions of this Policy, we will pay Damages in excess of any SIR that you are legally obligated to pay because of Bodily Injury or Property Damage to which this Policy applies if caused by an Accident and resulting from the ownership, maintenance, or use of a Scheduled Auto as identified in the Policy, on the Declarations or any Endorsement if:

    a.  The Accident occurs during the Policy Period; and

    b.  You have complied with all the conditions set forth in Section VII – Conditions of the Policy, including without limitation all the reporting and notification requirements. The Accident occurs within the radius of operation for the Scheduled Auto as identified on the Declarations or any Endorsement and within the United States of America; and

    c.  The Scheduled Auto is in Commercial Business Use at the time of the Accident; and

    d.  The Scheduled Auto is being operated by a Scheduled Driver at the time of the Accident.

    The date of an Accident is the date upon which the Accident that results in Bodily Injury or Property Damage occurs regardless of when the Bodily Injury or Property Damage is first discovered or first manifest or reported. Claims arising from Accidents occurring prior to the Policy Period are not covered regardless of when Damages are first manifest or discovered.

2.  We have both the right and the duty to provide for your defense with respect to a Claim covered by the Policy. We have the exclusive right to designate and appoint legal counsel to represent you and to otherwise control such defense. Notwithstanding anything to the contrary, our duty to provide for such defense will immediately terminate:

a.  When the applicable Limits of Liability of the Policy is exhausted by payment of Damages and/or Claim Expenses (In no event shall Claim Expenses reduce the Limit of Liability shown on the Insured's Declarations to a sum less than the statutory minimum limits provided by law. The maximum Limit of Liability applies to a total sum which the Insured, or the Insurer, become legally obligated to pay by reason of any injury or damage for which coverage is provided by the Policy, including any supplementary payment either through adjudication or compromise, and shall also include any hospital, medical, or funeral charges, and sums paid or payable as salaries, wages, compensation, fee charges, interest, or expenses for doctors, nurses, investigators, attorneys, and other persons, relating to any settlement, adjustment, investigation, or defenses of any Claim. Claim Expenses shall not include any charges for the Insurer's personnel salary or any part of the normal operating overhead of the Insurer.); or

b.  If the Insured fails to pay any SIR obligation imposed by this Policy in a timely manner; or

c.  If the Application, including any supplemental information related thereto, is discovered by us to contain any material inaccuracies, omissions, mistakes, misrepresentation, false statements or errors of fact, regardless of whether the misrepresentation was a result of the Insured's insurance broker or agent's error of omission, commission, mistake, negligence, fraud, or criminal conduct; or

d.  If you violate any of the conditions set forth in this Policy; or

e.  If Suit is brought outside of the United States of America or its territories.

3.  We have the sole right, but not the duty, under this Policy to settle those otherwise covered Claims for which the proposed amount to be paid as Damages does not exceed the applicable Limits of Liability. Any such settlement will be binding upon the Insured and will not require the Insured's prior consent or ratification. Payment of settlement funds or expenses by us shall not relieve you of your duty to make timely payment of any applicable SIR.

4.  We will pay with respect to any Claim we defend:

a.  Claim Expenses we incur; or

b.  Costs of Suit pursuant to statute or order of court after a verdict is entered against the Insured in the Suit; and

c.  Any judgment or part of a judgment that does not exceed our Limit of Liability; and

d.  All interest on any judgment that accrues after entry of the judgment and before we pay, tender, or deposit with the court that part of the judgment that does not exceed our Limits of Liability.

5.  Any of the above payments are part of and will reduce the Limits of Liability provided by this Policy. Notwithstanding the foregoing, we have no obligation to defend any criminal investigation or prosecution of or criminal proceeding against any Insured.

6.  In the event that any of the terms, limitations, conditions, definitions, exclusions, or other provisions of this Policy or any Endorsement(s) attached to it are found by a court of competent jurisdiction to be unenforceable or in contradiction to applicable law because of a financial responsibility requirement, the Named Insured agrees to reimburse us for any and all payments made by the Company on account of any Accident, Claim, or Suit involving a breach of the terms of the Policy, and for any payment that the Company would not have been obligated to make under the provisions of the Policy (including Claim Expenses we incur) but for the imposition of that financial responsibility requirement.

B.  Liability Exclusions

In the event that any of the exclusions stated in this Policy are found by a court of law to be unenforceable or in contradiction to applicable law in regards to a specific Claim, the invalid provision is to be interpreted as providing the minimum insurance coverage required under the financial responsibilities laws, in place of the invalid exclusion, for such Claim.

This Policy does not cover, and we will not be obligated to defend you against or pay Damages on your behalf for any of the following:

1. Any obligation of an Insured under workers' compensation, disability benefits, unemployment compensation law, or any similar law, or any law relating to any employer/employee benefits.

2. Bodily Injury to:

    a. An employee of an Insured arising out of and in the course of:

        (1) Employment by an Insured, or

        (2) Performing duties related to the conduct of the Insured's business; or

    b. The spouse, child, parent, brother, or sister of an employee of an Insured as a consequence of Bodily Injury to such employee.

    This Bodily Injury Exclusion applies:

    c. Whether an Insured may be liable as an employer or in any other capacity; and

    d. To any obligation to share Damages with or repay someone else who must pay Damages because of the injury, including Damages awarded for contribution or indemnity suits.

3. Bodily Injury or Property Damage:

    a. Alleged by one Insured against any other Insured (if the Insured is an organization, this exclusion shall apply to any parent, subsidiary, or affiliated company of the Insured); or

    b. Arising out of acts of an Insured or third-party general contractors, subcontractors, independent contractors, or property owners or their employees involving Claims or Suits alleging negligent hiring of employees or subcontractors, failure to contract with subcontractors, negligent supervision, or any liability relating to any independent contractor's service or failure to provide service.

4. Claims or Suits brought by:

    a. One Insured or any of its successors, assigns, subsidiaries, parent entities, agents, or affiliates against another Insured or any of its successors, assigns, subsidiaries, parent entities, agents, or affiliates; or

    b. Any division or department of any of the entities described in subparagraph a of this section; or

    c. Any officer, director, or employee of any of the entities described in subparagraph a. of this section.

5. Claims related to or arising out of:

    a. Employment policies or practices of an Insured including, but not limited to, refusal to employ, discrimination, failure to accommodate, termination, discharge, harassment, coercion, demotion, evaluation, reassignment, discipline, defamation, or humiliation; or

    b. Employment benefit laws affecting an Insured; or

    c. Wage or compensation disputes of any kind, including without limitation, any claims arising under the Fair Labor Standards Act, or any similar state or federal law; or

    d. Employment of any person by the Insured in violation of the law as to age, or of any person under 14 years of age if there is no limiting legal age limit.

6. Claims related to or arising out of the actual, alleged, or threatened commission of any act relating to sexual activity including, but not limited to, sexual abuse, molestation, or harassment. Claims arising out of or related to such sexual activity are excluded from coverage:

   a. Whether or not caused or committed by or at the direction of the Insured, its employees, patrons, patients, guests, or other persons lawfully or unlawfully on the Insured's premises or who lawfully or unlawfully come in contact with the Insured's patients, patrons, or employees, or guests;

   b. Notwithstanding that the Claim may allege negligent hiring or entrustment, placement, training, or supervision, failure to provide adequate security or any other allegation of intentional, negligent, or reckless conduct which facilitated or permitted the sexual activity to occur; and

   c. Whether or not any Bodily Injury or Property Damage sustained by any person as a result of such activity was expected or intended by the person who engaged in the activity.

7. Claims related to or arising out of actual or alleged assault and/or battery, whether caused by or at the direction of the Insured, the Insured's employees or patrons, or from any cause whatsoever. This Policy further excludes claims, accusations, or charges of negligent hiring, placement, training, or supervision regarding any actual or alleged assault and battery. No coverage is provided for Claims alleging negligent hiring or entrustment, training or supervision, failure to provide adequate security, or other allegations of intentional, negligent, or reckless conduct related to actual or alleged assault and/or battery.

8. Personal Injury.

9. Advertising Injury.

10. Bodily Injury or Property Damage for which an Insured is obligated to pay Damages by reason of the assumption of liability under any contract or agreement. This exclusion does not apply to liability for Damages:

    a. Assumed in a contract or agreement specifically approved by the Insurer by Endorsement, provided the Bodily Injury or Property Damage occurs subsequent to execution of the contract or agreement; or

    b. That the Insured would have in the absence of the contract or agreement.

11. Bodily Injury or Property Damage for which any Insured may be held liable by reason of:

    a. Causing or contributing to the intoxication of any person; or

    b. The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    c. The violation of any statute, ordinance, or regulation relating to the sale, gift, distribution, or use of alcoholic beverages or controlled substances; or

    d. The use of alcohol, narcotics, intoxicants, or illegal drugs.

12. Bodily Injury or Property Damage resulting from the handling of property:

    a. Before it is moved from the place where it is accepted by an Insured for movement into or onto the Scheduled Auto; or

    b. After it is moved from the Scheduled Auto to the place where it is finally delivered by an Insured;

    c. Resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the Scheduled Auto; or

d. Owned, loaned, or transported by or in the care, custody, or control of an Insured.

13. Bodily Injury or Property Damage arising out of the use of firearms by, on behalf of, or at the direction of any Insured.

14. Bodily Injury or Property Damage arising out of the ownership, boarding, or use of any kind of animal, whether or not domesticated.

15. Bodily Injury or Property Damage arising out of the use, operation, or maintenance of a Scheduled Auto by anyone other than an Insured.

16. Bodily Injury or Property Damage directly or indirectly resulting from acts, treatments, services, lack of services, errors or omissions, or other actions provided by an Insured outside of the Policy Period regardless of the date the Bodily Injury or Property Damage was first manifest, discovered or reported.

17. Coverage or indemnity for any Claim or Suit arising prior to, during and/or subsequent to the Policy Period, based directly or indirectly upon, and arising out of, or related to:

   a. Asbestos, asbestos fibers, asbestiform talc, or any material and/or substance containing asbestos, asbestos fibers, or asbestiform talc or any asbestos related to Bodily Injury or Property Damage, or exposure to asbestos, asbestos fibers, asbestiform talc fibers, asbestiform talc in any form, and/or manifestation of any asbestos related to Bodily Injury, including but not limited to asbestos, mesothelioma, and/or bronchogenic carcinoma; or

   b. Any alleged act, error, omission, or duty involving asbestos, asbestos fibers, asbestiform talc, or any material and/or substances containing asbestos, asbestos fibers, or asbestiform talc, its use, exposure, presence, existence, detection, removal, elimination, or avoidance; or

   c. The use, exposure, presence, existence, detection, removal, elimination, or avoidance of asbestos, asbestos fibers, asbestiform talc or any material and/or substances containing asbestos, asbestos fibers, or asbestiform talc in any environment, building, or structure.

18. Any Claim related to, caused by, or arising from Pollution. This exclusion applies to any Pollution arising out of the actual, alleged, or threatened spilling, discharge, dispersal, seepage, migration, release, or escape of Pollutants at any time, including without limitation, the following:

   a. Pollution at or from any premises, site, or location that is or was at any time owned or occupied by, or rented, or loaned to any Insured; or

   b. Pollution at or from any premises, site, or location which is or was at any time used by or for any Insured or others for the handling, storage, disposal, processing, or treatment of waste or Pollutants; or

   c. Pollutants which are or were at any time transported, handled, stored, treated, disposed of, or processed by or for any Insured or any person or organization for whom any Insured may be legally responsible; or

   d. Pollution at or from any premises, site, or location on which any Insured or any contractors or subcontractors working directly or indirectly on any Insured's behalf are performing operations; and

   e. Pollution arising out of any fuel or other fluids from any Covered Auto, including without limitation, any overturn, collision, damage, mechanical defect or leakage, or during work performed on any such vehicle.

f. Any Loss, Claim, cost, or expense arising out of any:

    (1) Request, demand, or order (including consent decrees, consent orders, or administrative procedures) that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of Pollutants; or

    (2) Claim or Suit by or on behalf of a governmental authority seeking recovery for testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of Pollutants.

Clean up costs incurred by or on behalf of any Insured for fuel spills from any Covered Auto are not covered by this Policy.

19. Any Claim related to, caused by, or arising from Hazardous Materials. This exclusion applies to any Hazardous Materials arising out of the actual, alleged, or threatened spilling, discharge, dispersal, seepage, migration, release or escape of Hazardous Materials, including without limitation:

    a. The handling, transportation, transfer, storage, disposal, processing, treatment, or releasing or exposure to Hazardous Materials.

    b. Any Loss, Claim, cost, or expense arising out of any:

        (1) Request, demand, or order (including consent decrees, consent orders, or administrative procedures) that any Insured or others test for, monitor, clean up, remove, contain, treat, or neutralize, or in any way respond to, or assess the effects of Hazardous Materials; or

        (2) Claim or Suit by or on behalf of a governmental authority seeking recovery for testing for, monitoring, cleaning up, removing, containing, treating, or neutralizing, or in any way responding to, or assessing the effects of Hazardous Materials.

Clean up costs incurred by or on behalf of any Insured for Hazardous Materials spills from any Covered Auto are not covered by this Policy.

20. Bodily Injury or Property Damage arising out of your willful violation of a penal statute or ordinance.

21. Bodily Injury or Property Damage arising out of the acts of an Insured's employee or agent outside the scope of his or her employment or duties.

22. Bodily Injury or Property Damage expected or intended from the standpoint of any Insured.

23. Bodily Injury or Property Damage arising out of the rendering or failure to render professional services and/or first-aid or medical services.

24. Any Claim for punitive or exemplary damages, fines, statutory penalties, or sanctions, whether imposed by law or otherwise, trebled or otherwise multiplied damages or any multiplied portion of a compensatory award, or the return or restitution of legal fees, costs, and expenses. Claims for or awards against any Insured for punitive or exemplary damages, fines, statutory penalties, or sanctions, whether imposed by law or otherwise, trebled or otherwise multiplied damages or any multiplied portion of a compensatory award are not covered by the Policy regardless of whether they are demanded or awarded based upon the conduct of an Insured or upon the conduct of others for whose conduct the Insured may be deemed to be vicariously liable.

25. Any Claim seeking relief other than for monetary damages including, but not limited to, claims for injunctions, temporary restraining orders, or other equitable relief or requiring any Insured to take any action other than the payment of compensatory monetary damages for Bodily Injury or Property Damage as defined herein.

26. Any Claim filed under:

    a. The Racketeer Influenced and Corrupt Organization Act; or

    b. The Employee Retirement Income Security Act.

27. Any Claim related to, caused by, or arising from mold and fungi including, but not limited to:

    a. Any sums that any Insured becomes legally obligated to pay as Damages because of Bodily Injury, Property Damage, Personal Injury, Advertising Injury, or Medical Payments directly or indirectly relating to the actual, potential, alleged, or threatened presence of mold, mildew, or fungi of any kind whatsoever, or any materials containing them at anytime; or

    b. Any Loss, cost, or expense to:

        (1) Any Insured or any other person or organization, that they may incur in testing for, monitoring, removing, treating, or in any way responding to the actual, potential, alleged, or threatened presence of mold, mildew, or fungi of any kind whatsoever, or any materials containing them, whether as a result of a request, demand, statutory, or regulatory requirement or otherwise; or

        (2) Any Insured or any other person or organization, that they may incur in connection with any Claim or Suit on behalf of any governmental authority or any person or organization relating to the actual, potential, alleged, or threatened presence of mold, mildew, or fungi of any kind whatsoever, or any materials containing them.

The Company neither assumes nor has any duty or obligation to defend any Insured with respect to any Claim or Suit seeking any Damages related to or resulting from mold, mildew, or fungi.

28. Any Claim related to, caused by, or arising from war and terrorism including, but not limited to:

Any Loss, Damage, cost, or expense of whatsoever nature directly or indirectly caused by, resulting from, or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the Loss, including:

    a. War, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

    b. Any "act of terrorism."

For the purpose of this War and Terrorism Exclusion, an "act of terrorism" means an act including, but not limited to, the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological, or similar purposes, including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This War and Terrorism Exclusion also excludes Loss, Damage, cost, or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing, or in any way related to acts anywhere in this war and terrorism section.

If the Company alleges that by reason of this War and Terrorism Exclusion, any Loss, Damage, cost, or expense is not covered by this Policy, the burden of proving the contrary shall be upon the Insured.

In the event any portion of this War and Terrorism Exclusion is found to be invalid or unenforceable, the remainder shall remain in full force and effect. War and terrorism coverage through an Endorsement in compliance with the U.S. Terrorism Risk Insurance Act of 2002 may be purchased for an additional premium.

29. Bodily Injury or Property Damage resulting from the ownership, maintenance, or use of a Scheduled Auto while the Scheduled Auto is being used in any professional or organized racing or demolition contest or stunting activity, while practicing for such contest or activity, or while that Scheduled Auto Is being prepared for such a contest or activity.

30. Bodily Injury or Property Damage arising from the maintenance or use of a Scheduled Auto by anyone under the influence of alcohol, other intoxicants, controlled substances, or narcotics, unless administered by the advice of a physician.

31. Bodily Injury or Property Damage:

    a. Arising out of, resulting from, caused by, or contributed to by exposure to silica products of any kind, including silica dust or silica in any form or silica in combination with other particulate suspension(s) or dust(s) other than silica;

    b. Any damages or any loss, cost, or suit by or on behalf of any governmental authority or any other alleged responsible party because of any request, demand, order, or statutory or regulatory requirement that any Insured or any other person or entity should be, or should be responsible for:

        (1) Assessing the presence, absence, or amount or effects of silica, particulate suspension(s), or dust(s);

        (2) Identifying, sampling, or testing for, detecting, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, abating, disposing of, or mitigating silica, particulate suspension(s), or dust(s); or

        (3) Responding to silica, particulate suspension(s), or dust(s) in any way other than as described above.

    c. Any supervision, instructions, recommendations, warnings, or advice given or which should have been given in connection with any of the subsections above; or

    d. Any obligation to share damages with or repay someone else who must pay damages as described in any of the subsections above.

32. Bodily Injury or Property Damage arising from an accident that occurs while the Scheduled Auto is being used in any Ridesharing Operations, unless such operations are part of those specified activities or operations specifically listed and described under this Policy. For purposes of this Exclusion, Ridesharing Operations include any service that arranges or provides one-time, real-time shared rides for a fee.

33. Bodily Injury to any passenger in the Insured's vehicle.

34. Any Claim involving, or arising out of, the use of a vehicle insured by this Policy in violation of federal or state hours-of-service regulations, including but not limited to regulations related to documenting or tracking such time.

35. Claims or Damages arising out of Cyber Liability. For purposes of this exclusion, Cyber Liability means a data breach, whether inadvertent or intentional, in which a third party's private or confidential information in the possession of any Insured is exposed, stolen or destroyed, regardless of whether the data breach is the result of conduct of the Insured. Cyber Liability, as used in this exclusion, includes any damage to data or tangible property arising from a computer virus. Cyber Liability also includes cyber extortion or network shutdowns.

36. Any Suit brought on behalf of a class or putative class.

# SECTION II — PHYSICAL DAMAGE COVERAGE

A. Insuring Agreement

1.  If Physical Damage coverage is listed on the Declarations or any Endorsement and the associated premium has paid for such coverage, subject to all other terms and conditions of the Policy, we will pay for Physical Damage to any Scheduled Auto with Physical Damage coverage and otherwise covered under this Policy:

    a.  Should an Accident causing Physical Damage result from those specified activities or operations to which this Policy is limited; and

    b.  If such Accident occurs during the Policy Period stated on the Declarations or any Endorsement and within the United States of America or its territories; and

    c.  You have complied with all the conditions set forth in Section VII – Conditions of the Policy, including without limitation all reporting and notification requirements.

2.  We will only cover Physical Damage:

    a.  Caused by fire, lightning, explosion, theft, vandalism; or

    b.  Caused by collision of a Scheduled Auto with another object or the Scheduled Auto's overturn.

3.  Towing & Labor including Storage

    If a scheduled Auto has Physical Damage as the result of an Accident as described above and must be towed from the location of the Accident to a place where it can be repaired or stored, we will pay for the towing and associated labor and storage costs but only up to the limit shown on the Declarations or any Endorsement. This limit of coverage applies per Accident. Any payment under this Endorsement will reduce the stated amount limit available on the Policy for that particular Auto. If there is no value shown on the Declarations or any Endorsement then there is no coverage for towing and associated labor and storage.

4.  Adequate Insurance—Coinsurance Penalty

    We will not pay a greater share of any Physical Damage than the proportion that the stated value of each Scheduled Auto listed on the Declarations or any Endorsement bears to the Actual Cash Value (ACV) of the respective Auto at the time of Loss. Payment of the Physical Damage will be reduced, as a coinsurance penalty, by the same proportion that the stated value of the Scheduled Auto with Physical Damage has to the full ACV of such Scheduled Auto. Each item or Scheduled Auto listed is deemed to be separately insured. In order to avoid a coinsurance penalty in the event of a Claim, each Scheduled Auto must be 80% insured to its respective ACV.

B. Physical Damage Exclusions

1.  We will not cover any Claim or make any payment for:

    a.  Physical Damage caused by, arising from, or related to Physical Damage identified in any exclusion under Section I. B. "Liability Exclusions" of this Policy; or

    b.  Physical Damage which is the direct result of wear and tear, freezing, mechanical or electrical breakdown; or

    c.  Physical Damage which is the direct result of blowouts, punctures, or other road damage to tires.

---

2. We will not cover Physical Damage to:

    a. Tapes, records, discs, or other similar audio, visual or data electronic devices designed for use with audio, visual, or data electronic devices;

    b. Any device designed or used to detect speed-measuring equipment such as radar or laser detectors and jamming apparatus intended to elude or disrupt speed measurement equipment;

    c. Any electronic equipment designed for the reproduction of sound, including, but not limited to radios and stereos, tape decks or compact disc players, or any other electronic equipment that receives or transmits audiovisual or data signals, including, but not limited to, citizen band radios, television monitor receivers, telephones, video cassette recorders, audio cassette recorders, two-way mobile radios, scanning monitor receivers, or personal computers, tapes, records, discs, or other media or accessories used with equipment previously described; or

    d. Any accessories used with the electronic equipment described in subparagraph c. above.

    Exclusions under this Section 2 shall not apply to:

    e. Equipment designed solely for the reproduction of sound and accessories used with such equipment, provided such equipment is permanently installed in the Scheduled Auto at the time of the Physical Damage, or such equipment is removable from a housing unit which is permanently installed in the Scheduled Auto at the time of the Physical Damage, and such equipment is designed to be solely operated by use of the power from the Scheduled Auto's electrical system, in or upon the Scheduled Auto; or

    f. Any other electronic equipment that is:

        (1) Necessary for the normal operation of the Scheduled Auto or the monitoring of the Scheduled Auto's operating system; or

        (2) An integral part of the same unit housing any sound reproducing equipment described in a. above and permanently installed in the opening of the dash or console of the Scheduled Auto normally used by the manufacturer for installation of a radio.

3. Any Physical Damage is excluded hereunder regardless of any other cause or event that may have concurrently contributed to such Physical Damage.

4. We will not cover any Physical Damage to a Scheduled Auto caused by or resulting from someone causing you to voluntarily part with the Scheduled Auto by trick or scheme or under false pretenses; or your acquiring a Scheduled Auto from a seller who did not or does not have legal title.

5. We will not cover Physical Damage to any Scheduled Auto while used in any professional or organized competition driving, racing, or experimental driving or stunting activity, while practicing for such contest or activity, or while that Scheduled Auto is being prepared for such a contest or activity.

C. Limit of Insurance

The most we will pay for Physical Damage in any one Accident is the lesser of:

1. The ACV of the damaged or stolen Scheduled Auto as of the time just prior to the Physical Damage occurring; or

2. The cost of repairing the Scheduled Auto with parts of like kind and quality; or

3. The cost of replacing the Scheduled Auto with a similar auto.

Any payment method will be adjusted for depreciation and physical condition as of the time of the Physical Damage. If payment is made in accordance with 1. or 3. above, you retain salvage of the Scheduled Auto and we will adjust any payment due to you to reflect the value of the salvage.

D. Deductible

For each Scheduled Auto, our obligation to pay for, repair, return, or replace damaged or stolen property will be reduced by any applicable deductible shown on the Declarations.

E. Loss Payment – Theft

At our option, we may:

1. Pay for, repair, or replace damaged or stolen property; or

2. Return the stolen property, at our expense, and pay for any damage that results to the Scheduled Auto from the theft; or

3. Take all or any part of the damaged or stolen property at an agreed or appraised value.

F. No Benefit to Bailee

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing, or transporting property for a fee regardless of any other provision of this Policy.

G. Replacement Parts

The Insurer, in its sole discretion, has the right and privilege to use non-OEM replacement parts for the repair or replacement of any Scheduled Auto in lieu of parts manufactured by the vehicle or equipment manufacturer.

## SECTION III — WHO IS AN INSURED?

A. The "Named Insured" is the person and/or entity expressly designated on the Declarations or in any Endorsement. If the person or entity designated as the Named Insured is:

1. An individual, the individual and the individual's spouse are Insureds, but only with respect to the conduct of business of which the individual and/or the spouse are the sole owners.

2. A partnership or joint venture, the Named Insured is an Insured; however, the partnership or joint venture's partners or members are also Insureds, but only with respect to the conduct of business of the partnership or joint venture.

3. A limited liability company, the limited liability company is an Insured; however, the limited liability company's members are also Insureds, but only with respect to their involvement with the limited liability company's business, and the limited liability company's managers are Insureds, but only with respect to their duties as the limited liability company's managers.

4. An organization other than a partnership, joint venture, or limited liability company, such organization is the Insured; however, the organization's executive officers and directors are Insureds, but only with respect to their duties as the organization's officers or directors. Such organization's stockholders are also Insureds, but only with respect to their liability as stockholders.

B. An "Insured" is also any Scheduled Driver of an otherwise Scheduled Auto who is maintaining or operating the Scheduled Auto for commercial business operations.

## SECTION IV — SCHEDULED AUTOS

A. Scheduled Autos

All of the vehicles that are covered under this Policy are specifically identified on the Declarations or any Endorsement as Scheduled Autos. Scheduled Autos must be listed with an associated premium shown and paid for each Scheduled Auto on the Declarations or any Endorsement for coverage to be afforded for such Scheduled Auto.

B. Vehicles You Acquire After the Policy Begins

Any vehicle you acquire after the Policy effective date will only become a Scheduled Auto and covered under this Policy if it is scheduled on the Policy by Endorsement attached thereto and the required premium has been timely paid. There is no grace period.

C. Certain Trailers and Mobile Equipment

The following types of vehicles are Scheduled Autos for liability coverage:

1. Trailers primarily for travel on public roads while being towed by a Scheduled Auto; and

2. Mobile Equipment while being carried or towed by a Scheduled Auto.

## SECTION V — LIMITS OF LIABILITY

A. The Limits of Liability shown on the Declarations and the conditions set forth below fix the most we will pay regardless of the number of:

1. Insureds; or

2. Claims made or Suits brought; or

3. Persons or organizations making Claims or bringing Suits.

B. Each Accident Limit of Liability listed on the Declarations or any Endorsement is the most we will pay for any combination of Damages and/or Claim Expenses because of all Bodily Injury and Property Damage arising out of any one Accident. Claim Expenses reduce the available Limits of Liability.  In no event shall Claim Expenses reduce the Limit of Liability shown on the Insured's Declarations to a sum less than the statutory minimum limits provided by law. The maximum Limit of Liability applies to a total sum which the Insured, or the Insurer, become legally obligated to pay by reason of any injury or damage for which coverage is provided by the Policy, including any supplementary payment either through adjudication or compromise, and shall also include any hospital, medical, or funeral charges, and sums paid or payable as salaries, wages, compensation, fee charges, interest, or expenses for doctors, nurses, investigators, attorneys, and other persons, relating to any settlement, adjustment, investigation, or defenses of any Claim. Claim Expenses shall not include any charges for the Insurer's personnel salary or any part of the normal operating overhead of the Insurer.

C. This Policy is subject to any and all Sub-limits identified in this Policy, including any identified on the Declarations or on any included Endorsement.

D. All Claim settlement costs and Claim Expenses are included within the Limits of Liability shown on the Declarations and are not in addition to such Limits of Liability. The Limits of Liability apply to the total sum which the Insured, or the Insurer, become legally obligated to pay by reason of any Bodily Injury or Property Damage for which coverage is provided by the Policy, including any supplementary payment either through adjudication or compromise, any hospital, medical, or funeral charges, and any sums paid or payable as salaries, wages, compensation, fee charges, interest, or expenses of doctors, nurses, investigators, attorneys, and other persons relating to any settlement, adjustment, investigation, or defense of any Claim.

E. The following items affect our Limits of Liability as outlined:

1. The Insured understands and agrees that the Insurer has no obligation under the coverage provided by the Policy to notify the Insured of the possibility that the maximum coverage payable is or may be exhausted by any Accident or combination of Accidents that occur or may occur during the Policy Period. The Insured, in his, her, or its sole discretion, must determine if additional coverage should be purchased, and the Insurer has no duty to make a determination or advise the Insured concerning additional coverage.

F. Notwithstanding anything contained in this Policy to the contrary, the Insurer's financial obligation imposed by the coverage with respect to all Claims, including any Claim Expenses and other related costs, incurred hereunder shall not exceed the amount specified on the Declarations as the Limit of Liability.

G. Amounts payable under paragraphs B, C, and D of this section above shall directly diminish the respective Limits of Liability as stated on the Declarations.

H. This Policy has been issued to the Insured in response to a request for coverage from the Insured, and its retained broker, if applicable. Various optional insurance has been offered to Insured by Insurer, including different types of insurance and different limits of liability, and Insured and its broker have expressly selected the type and amount of coverage desired. As such, Insured, and its retained broker if applicable, are solely responsible for determining the type and amount of insurance needed for Insured's operations and the amount of insurance required by any federal or local laws which may apply to Insured's specific operations. In no event shall Insurer be responsible for determining the type and amount of insurance required by federal or local laws which may apply to Insured's specific operations, and Insurer makes no warranty that this Policy complies with all laws that may apply to Insured's various business operations. In the event any court, arbitrator or regulatory agency reforms or revises this Policy to comply with laws applicable to the type or amount of insurance required by Insured's specific operations, Insured and its broker shall indemnify and hold Insurer harmless from any increased limit of liability or other exposure created by such reformation or revision, including attorney fees and costs arising therefrom.

## SECTION VI — SELF-INSURED RETENTION (SIR) OBLIGATION

A. Our obligation to make any payments under this Policy shall only arise after the payment by the Insured of any SIR amount as specified on the Declarations, has been timely tendered. The SIR amount shall apply separately to each and every Claim and to each and every Insured. The Insurer shall have no duty to make any payment for the defense or settlement of any Claim, or for the satisfaction of any judgment, until the Insured has paid the SIR. The Limits of Liability of this Policy include the amount of the SIR and are not in excess thereof.

B. The Insured will pay 100% of the SIR on each and every Claim for Damages and/or Claim Expenses before any payment is due pursuant to the terms of this Policy. The SIR applies to each and every Claim regardless of whether a claimant presents multiple Claims. The following obligations and restrictions apply to the SIR:

1. The Insurer may assume control and defense of all Claims, Suits, and proceedings which, at its sole discretion, may involve this Policy. Such assumption of the control and defense of any Claim, Suit, or proceeding by the Insurer, including the selection and/or appointment of defense counsel by the Insurer, shall not affect the Insured's responsibility to pay the SIR.

2. A separate SIR shall be paid for each Claim. Multiple Claims arising from the same event shall be subject to multiple SIRs.

3. The Insurer, at its sole discretion and without the consent of the Insured, may agree to the payment of all or any part of the SIR in satisfaction of Claim Expenses, settlements, Damages, or judgments.

4. The Insurer, at its sole discretion, may pay the amount of the SIR from its own funds in satisfaction of Claim Expenses, Damages, settlements or judgments. In the event the Insurer chooses to make such payment, the Insured shall reimburse the Insurer within 15 days of the mailing of a demand by the Insurer.

5. The Insurer, at its sole discretion, may direct the Insured to pay all or any part of the SIR to a third party in satisfaction of Claim Expenses incurred or Damages paid or of settlement or judgment amounts. The Insured shall make any required SIR payment within 15 days of the Insurer's direction to make such payment.

6. In the event the Insured fails to reimburse the Insurer for any SIR amount advanced by the Insurer and the Insurer incurs collection expenses, the Insurer shall be entitled to recover such collection expenses, including reasonable attorneys' fees and expenses, from the Insured to the extent permitted by law.

7. The Insurer has the right, but not the duty, to settle any covered Claim for which the proposed amount to be paid in Damages and Claim Expenses does not exceed the applicable Limits of Liability. Such settlements are binding on the Insured and do not require the Insured's prior consent or ratification.

   a. Any settlement agreed to by the Insurer pursuant to its settlement right shall be subject to cancellation by the Insurer if the Insured fails to pay the SIR timely.

   b. If any settlement agreed to by the Insurer is not concluded due to the failure of the Insured to pay the SIR for any reason, the liability of the Insurer for all Claims Expenses, Damages, and/or settlement and judgment amounts shall be limited to the amount for which the Claim could have been settled but for the Insured's failure to tender the SIR.

8. This Policy shall not apply to any Claim first reported to the Insurer while the Insured is in default in the payment of any SIR due from the Insured.

9. Failure to timely pay the SIR as required shall be considered to be the same as failure to pay premium when due, and the Insurer may, at its sole discretion, cancel the Policy for such non payment subject to the same notice requirements as set forth in the Policy for cancellation for non-payment of premium. Such cancellation shall not relieve the Insured of its duty to pay any SIR, and the Insurer may offset any return premium due the Insured against any unpaid SIR and take any other necessary steps to collect any unpaid SIR.

### SECTION VII — CONDITIONS

A. Notice of Accident, Potential Claim, Claim, or Suit

1. As an express condition precedent to coverage under this Policy, you must give us immediate written notice, as soon as possible and in no event later than 72 hours, of any incident, event, occurrence, loss, or Accident which might give rise to a Claim covered by this Policy. Written notice must be given to: Claims Direct Access, P.O. Box 4439, Sandy, Utah 84091-4439, U.S.A. Phone: (877) 585-2849 or (801) 304-5530; Fax: (877) 452-6909 or (801) 304-5536, and include:

   a. How, when, and where the incident, event, occurrence, loss, or Accident took place; and

   b. The names and addresses of any injured persons and witnesses; and

   c. The nature and location of any injury or damage arising out of the Accident.

2. You and any other involved Insured must:

   a. Immediately or at the earliest practicable moment, and in no event later than 10 days after receipt by you, send us copies of any demands, notices, summonses, or legal papers received in connection with any Claim or Suit and act in all diligence and prudence to resolve the Claim or Suit; provided, however, that no settlement in excess of any applicable SIR will be agreed to by the Insured without the Insurers' express written consent;

   b. Authorize us to obtain records and other information;

   c. Cooperate with us in the investigation, settlement, or defense of the Claim or Suit—the Insurer may require that the Insured submit to examination or questioning, attend hearings, depositions, and

trials—additionally, in the course of investigation or defense, the Insurer may require written and/or sworn statements concerning the Claim; and

    d. Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured, or which provides similar benefits to the Insured, because of injury or damage to which this Policy may also apply.

3. No Insured will, except at his own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our prior consent in excess of any applicable SIR without prior written consent of the Insurer.

4. You must also do the following:

    a. Promptly notify the police if the covered Auto or any of its equipment is stolen;

    a. Take all reasonable steps to protect the covered Auto from further damage and keep a record of your expenses;

    b. Permit us to inspect the covered Auto and records proving the Loss before its repair or disposition; and

    c. Not admit any liability during the Accident investigation.

B. Legal Action Against Us

No person or organization has a right under this Policy to:

1. Join the Insurer as a party or otherwise bring them into a Suit asking for Damages from an Insured; or

2. Sue the Insurer under this Policy unless all of the terms of the Policy have been fully complied with by the Insured.

A person or organization may sue the Insurer to recover on an Agreed Settlement or a final judgment obtained after an actual trial against an Insured, but the Insurer will not be liable for Damages that are not payable under the terms of this Policy or that are in excess of the applicable Limits of Liability available to an Insured.

C. Other Insurance

1. If other valid and collectible insurance, whether primary, excess, or contingent or on any other basis, including any form of self-insurance or SIR, is available to an Insured for a Loss covered under this Policy, then:

    a. This Coverage is excess over the other insurance, including any form of self-insurance or SIR; and

    b. We will have no duty to defend any Claim or Suit that any other insurer has a duty to defend. If no other insurer or issuer of a form of self-insurance or SIR defends, we may undertake to do so, but we will then be entitled to enforce the Insured's rights against those other insurers, self-insurers, or self-insured entity for defense costs, contribution, or indemnity.

2. When both this Policy and other insurance, whether primary, excess, or contingent or on any other basis, including any form of self-insurance or SIR, apply to the Loss on the same basis, we will not be liable under this Policy for a greater proportion of the Loss than that stated in the applicable contribution provision below:

    a. If all such other insurance provides for contribution by equal shares, we shall not be liable for a greater proportion of such Loss than that which would be payable if each Insurer or self-insured entity contributes an equal share until the share of each Insurer or self-insured entity equals the lowest applicable Limits of Liability under any one policy or the full amount of the Loss is paid. With respect

to any amount of the Loss not so paid, each remaining Insurer or self-insured entity will then contribute an equal share of the remaining amount of the Loss until each such Insurer has paid its limit in full or the full amount of the Loss is paid.

    b.   If all such other insurance does not provide for contribution by equal shares, the Insurer shall not be liable for a greater proportion of such Loss than the applicable Limits of Liability under this Policy bears to the total applicable Limits of Liability of all other valid and collectible insurance applicable to such Loss.

   3.   If this Policy and any other policy or coverage contract issued to you by us or any company affiliated with us apply to the same Accident, the Limit of Liability or any applicable Sub-limits under all of the policies and coverage contracts shall not exceed the highest applicable Limit of Liability or Sub-limit under any one policy or coverage contract. This condition does not apply to any policy or coverage contract issued by us, or an affiliated company, specifically to apply as excess insurance over this Policy.

D.   Premium

   1.   We will compute the premium for this Policy in accordance with our rules and rates at the time coverage is issued or renewed on behalf of the Insured.

   2.   The premiums shown on this Policy as the advance premiums are minimum-earned and deposit premiums only. At the close of each audit period, we will compute the earned premium for the Policy Period shown on the Declarations. Audit premiums are due and payable on notice to the Insured. If the sum of the advance and audit premiums paid for the Policy Period is greater than the earned premium charge, any prepaid premium charges become the fully earned premiums for the Policy Period.

   3.   The Insured must keep records of the information we need for coverage charge computation and send us copies at such times as we may request them.

   4.   In the event of any Claim, the minimum, fully-earned premium for the Policy will be 100% of the total premium stated on the Declarations, and such minimum, fully-earned premium will replace any other minimum-earned premiums charged and will not be subject to short-rate or pro-rata adjustment.

   5.   In the event the Insured fails to tender the required premium amount and the Insurer incurs collection expenses, the Insurer shall be entitled to recover all costs of collection including, but not limited to reasonable attorneys' fees, costs, and expenses from the Insured.

E.   Insured's Representations and Warranties

By accepting this Policy, you represent, warrant, and agree that:

   1.   The completed Application and any supplemental applications or other documentation provided to obtain this Policy do not contain any material inaccuracies, omissions, mistakes, misrepresentation, false statements or errors of fact, regardless of whether the information was provided by you or your broker or agent;

   2.   You understand the information provided in and with your Application for insurance has been relied upon by the Insurer in pricing coverage and issuing the Policy and the Application, along with any other information provided by you, forms a part of the Policy; and

   3.   The Policy is a "manuscript policy," which means it does not follow any "standard" insurance policy form and represents a negotiated agreement between you and the Insurer, and you had the opportunity to seek the advice of legal counsel with regard to the negotiations for and the execution and performance of the Policy; and

   4.   Any insurance broker or agent involved in obtaining the Policy represents you and not the Insurer, and the broker or agent is not authorized to bind coverage on behalf of the Insurer, and you do not assume the broker or agent has any implied or apparent authority to bind the Insurer; and

5. You are subject to all the Policy provisions, terms, and conditions.

F. Transfer of Rights of Recovery Against Others To Us

If an Insured has rights to recover all or a part of any payment for Damages or Claim Expenses we have made under this Policy from any person or organization, those rights are hereby transferred to the Insurer. The Insured must do nothing after the Loss to impair these rights. At our request, the Insured will bring Suit or transfer those rights to us and will do all things we request to assist us to enforce those rights and collect payments made under the Policy.

G. Non-Assignable

No interest, coverage, or rights under this Policy may be assigned or transferred to any other person or entity without the prior written consent of the Insurer. This Policy is issued to the Insured as owned and managed at the time of the Application and does not transfer upon a change in ownership or management without prior written approval of the Insurer.

H. Cancellation

1. Except as indicated in the Declarations or any Endorsement, by entering into this Policy, neither the Insurer nor the Insured are bound to continue coverage through the entire Policy Period and either may cancel the Policy for any reason, subject to the terms and conditions of this Policy, including without limitation, the conditions regarding earned and returnable premiums.

2. The Insured shown on the Declarations may cancel this Policy by mailing a request to cancel to the Insurer.

3. The Insurer may cancel this Policy by mailing first class or by hand delivery to the Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium or upon your failure to pay any premium or any other cost or fee required to be paid under the terms of this Policy; or

   b. 10 days before the effective date of cancellation if we cancel for any other reason, unless a longer period of time is specifically required by applicable law.

4. In the event this Policy is cancelled by the Insurer for nonpayment of premium, any other policy issued to the Insured by the Insurer, or one of its affiliates, will also become subject to cancellation with 10-days notice, or as required by applicable law.

5. The Insurer will mail or deliver any notice of cancellation or any other notice to be delivered under this Policy to the Insured's mailing address shown on the Declarations or on any written Endorsement changing such address.

6. Notice of cancellation will state the effective date of cancellation and the Policy Period will end on that date.

7. If this Policy is cancelled by the Insured or Insurer, the premium for the period from the date of cancellation to the expiration date will be refunded at the greater of the percentage of Premium Earned at Inception shown on the Declarations or the short-rate, all of which will be deemed the minimum, fully earned premium for the cancelled Policy. The total premium will be deemed the minimum, fully earned premium in the event a Claim is made at any time on this Policy prior to cancellation. The cancellation will be effective even if we have not made or offered a refund.

8. If notice is mailed, a prepaid proof of mailing is sufficient proof of notice to the Insured. Notice deposited in the mail in the manner described above shall be effective when so deposited.

9. This Policy is not subject to renewal. The Insurer has no obligation to offer you insurance in the future and has no obligation to provide you with further notice of the expiration of this Policy. The Insurer may, at its option, offer you terms for future separate policies.

10. At no time will cancellation of this Policy for any reason require the Insurer to refund an amount of premium over or above the minimum, fully earned premium set out in this Policy.

I.   Changes

This Policy, including any Endorsements, contains all of the agreements between the Insured and the Insurer concerning the insurance provided by the Policy. The coverage terms can be amended or waived only by Endorsement issued by us and made a part of the Policy.

Endorsements adding additional Insureds, coverage, or otherwise materially changing the Policy will require additional premium to be collected from the Insured before the Endorsement will become effective. Additional premium associated with any Endorsement will be calculated by the Insurer based upon its then current rates; although, no specific rate is guaranteed to the Insured.

J.   Examinations, Inspections, and Surveys

The Insurer has the right, but is not obligated to:

1.   Examine and audit your books and records as they relate to this Policy at anytime during the Policy Period and up to three years thereafter;

2.   Make inspections and surveys of the Insured and its operations, premises, equipment, property, and books at anytime;

3.   Prepare reports on the results of the inspections and surveys, and provide copies of said reports to the Insured; and

4.   Recommend and/or require changes, repairs, or other acts to be completed as a condition precedent to continued coverage under the Policy.

The inspections, surveys, reports, or recommendations relate to the insurability of an Insured and the coverage charge to be made. We do not make safety inspections, undertake to provide legal advice or opinions, or perform the duty to any person or organization to provide for the health or safety of workers or the public, and we do not warrant that conditions of the Insured's premises or other working environment under the Insured's control are safe or healthy, or comply with any or all federal, state, county, or local laws, regulations, codes, or standards. This limitation of our service applies not only to us, but also to any rating, advisory rating service, or similar organization or individuals that may provide insurance inspections, surveys, reports, or recommendations at the request of the Insurer.

K.   Appraisal for Physical Damage Loss

If there is a disagreement on the value of the Scheduled Auto or the amount of the Damage or Loss, either of us may make written demand for an appraisal of the value of the Scheduled Auto or the amount of Damage or Loss. In this event, each party shall select an independent, competent, and impartial appraiser. After completing their own respective evaluations, the appraisers shall confer with each other. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the value of the property or the amount of Damage or Loss. If the appraisers fail to agree, the two appraisers will select an independent, competent and impartial umpire. If the appraisers cannot agree on the selection of the umpire, either may request that a judge of a Utah court having jurisdiction make the selection. Upon selection of an umpire, the appraisers will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will pay its chosen appraiser, and bear the other expenses of the appraisal and umpire equally. The appraisal will not determine issues of coverage. If there is an appraisal, we still retain our right to deny the claim.

L.   Ultimate Net Loss

All claim settlement costs, defense costs, and related costs ("Claim Expenses") are included expenses within the maximum Limit of Liability shown on the Insured's Declarations, and not in addition to such maximum Limit of Liability. However, in no event shall Claim Expenses reduce the Limit of Liability shown on the

Insured's Declarations to a sum less than the statutory minimum limits provided by law. The maximum Limit of Liability applies to a total sum which the Insured, or the Insurer, become legally obligated to pay by reason of any injury or damage for which coverage is provided by the Policy, including any supplementary payment either through adjudication or compromise, and shall also include any hospital, medical, or funeral charges, and sums paid or payable as salaries, wages, compensation, fee charges, interest, or expenses for doctors, nurses, investigators, attorneys, and other persons, relating to any settlement, adjustment, investigation, or defenses of any Claim. Claim Expenses shall not include any charges for the Insurer's personnel salary or any part of the normal operating overhead of the Insurer.

M. Concealment, Misrepresentation, or Fraud

This Policy is void in the case of fraud by you at anytime as it relates to this Policy, and is also void if you or any other Insured at anytime intentionally conceal or misrepresent a material fact concerning this Policy, a covered Auto, your interest in a covered Auto, or a Claim under this Policy.

N. Premium Audit

The initial premium for this Policy represents a minimum estimated premium based upon the exposures you told us you would have when you requested coverage. We expressly retain the right to conduct a premium audit of your records at anytime to determine if the exposures are ultimately greater than you told us. This premium audit may take the form of a request of you to provide proof of exposures by completing a self-audit form and supplying any type of supporting business records (such as proving gross receipts) or an audit conducted by our agent by physically inspecting your books and records. In the event you fail to comply with any premium audit request, including failing to provide any requested information, you authorize us to assume additional exposures and charge and collect from you the greater of an additional premium equal to 25% of the original premium and the actual amount due based upon any premium audit findings. You also expressly agree to pay any costs associated with our efforts to collect any additional premium due from you. Under no circumstance will the minimum estimated premium be reduced as the result of any premium audit—the original premium represents a minimum premium for the Policy.

O. False or Fraudulent Claim

If any Insured shall make any Claim under this Policy knowing such Claim to be false or fraudulent, as regards amount or otherwise, this Policy shall become null and void and all coverage hereunder shall be forfeited.

P. Given the unique features of the coverage being provided to the Insured, coverage has been quoted, bound and issued with the express condition that the Insured acknowledge receipt and acceptance of the terms and conditions of coverage by returning the Receipt Form provided herewith. Coverage is subject to cancellation in the event the Insured fails to acknowledge receipt and acceptance of the terms and conditions of coverage by returning the Receipt Form provided.

## SECTION VIII — DEFINITIONS

A. "Accident" means an incident, event, or circumstance which is unexpected and unintended from the standpoint of any Insured.

B. "Actual Cash Value" or "ACV" means:

1. The amount it would cost to repair or replace property with material of functionally like kind and quality, less allowance for physical deterioration, wear and tear, obsolescence and depreciation.

2. When the Damage or Loss to the property creates a total Loss, Actual Cash Value means the market value of the property in a used condition equal to that of the destroyed property.

3. Otherwise Actual Cash Value means the market value of functionally identical property less reasonable deduction for physical deterioration, wear and tear, obsolescence and depreciation.

C. "Advertising Injury" means injury arising out of one or more of the following offenses:

   1. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

   2. Oral or written publication of material that violates a persons right of privacy;

   3. Misappropriation of advertising ideas or style of doing business; or

   4. Infringement of copyright, trademark, patent, title, or slogan.

D. "Agreed Settlement" means a settlement and/or release of liability signed and/or authorized in writing by the Insurer.

E. "Application" means the application for insurance coverage form, and any information provided therewith, completed by or for or on behalf of the Insured requesting insurance coverage from the Insurer.

F. "Auto" means a land motorized vehicle, trailer, or semi-trailer designed for travel on public roads, including any attached machinery or equipment. Auto does not include Mobile Equipment.

G. "Bodily Injury" means physical injury to a person's body, including death, but shall exclude:

   1. Sickness or disease sustained by any person or death resulting therefrom; and

   2. Mental or emotional distress, mental anguish, humiliation, embarrassment, mental anxiety, or other emotional, psychological or mental injury, or any physical manifestation thereof.

H. "Claim(s)" means any demand for Damages, including a written demand, a civil action, Suit, or institution of arbitration proceeding.

I. "Claim Expenses" mean:

   1. All fees, costs, and expenses charged by any lawyer or other service provider designated by the Insurer to represent the Insured; and

   2. All other fees, costs, and expenses, including the Insurer's own internal fees, costs, and expenses, or those of an affiliate, resulting from the investigation, adjustment, defense, and appeal of a Claim, as authorized by the Company.

   The determination of the Insurer as to the reasonableness of Claim Expenses shall be conclusive on the Insured. All Claim Expenses reduce the available Limits of Liability.

J. "Commercial Business Use"

   1. If you are a motor carrier engaged in the business of transporting passengers or goods for hire, "Commercial Business Use" means the Scheduled Auto is being operated pursuant to the Insured's assignment to haul a specified load or is on standby for further deliveries. A Scheduled Auto is no longer in commercial business use when a delivery assignment has been completed and the Scheduled Auto is no longer under dispatch.

   2. If you are not a motor carrier, "Commercial Business Use" means the Scheduled Auto is being used or operated in the course and scope of the specified activities or operations to which this Policy is limited.

K. "Damage(s)" means a compensatory sum, monetary judgment, award, or settlement an Insured is or may reasonably become legally obligated to pay as the result of an Accident, but does not include fines or statutory penalties, sanctions, whether imposed by law or otherwise, punitive, exemplary, treble damages, or any multiplied portion of a compensatory award, nor the return or restitution of legal fees, costs, and expenses.

L. "Declarations" means the summary of coverage provided in conjunction with this Policy setting forth essential terms that are expressly deemed a part of this Policy.

M. "Endorsement" means any additional coverage or limitation of coverage contained in any attachment or addendum to this Policy. Any Endorsement is an indispensable and indivisible part of this Policy.

N. "Hazardous Materials" means any nuclear, radioactive, toxic, or explosive material, substance, or waste, and any by-products thereof, and the explosive, toxic, and dangerous properties of such material, substance, or waste and any byproducts thereof.

O. "Limit(s) of Liability" means the maximum amount the Insurer will be obligated to pay for an otherwise covered Claim, including payment for Claim Expenses, Damages, or any other sums due under this Policy, the amount of which is set forth on the Declarations.

P. "Mobile Equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

1. Bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads;

2. Vehicles maintained for use solely on or next to premises you own or rent;

3. Vehicles that travel on crawler treads; or

4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   a. Power crane, shovels, loaders diggers, or drills; or

   b. Road construction or resurfacing equipment such as graders, scrapers, or rollers.

Q. "Personal Injury" means injury, other than Bodily Injury, arising out of one or more of the following offenses:

1. False arrest, detention, or imprisonment;

2. Malicious prosecution, discrimination, or civil rights violations, wrongful or retaliatory discharge;

3. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy;

4. Oral or written publication of material that slanders or libels a person's or organization's goods, products, or services; or

5. Oral or written material that violates a person's right of privacy.

R. "Physical Damage" means damage to tangible property you own, use, rent, or lease. Physical Damage does not include diminution in value or loss of use.

S. "Policy" means the Policy issued by the Insurer to the Insured including all Endorsements thereto.

T. "Policy Period" means the period of time beginning on the "Effective Date," as stated on the Declarations, and ending on the earlier of the initial "Expiration Date," as stated on the Declarations, and any effective cancellation date pursuant to the terms of the Policy.

U. "Pollutants" means any solid, liquid, gaseous, or thermal irritant or contaminant including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals, Hazardous Materials or any other waste, including materials to be recycled, reconditioned, or reclaimed.

V. "Property Damage" means:

1. Damage to tangible property, including all resulting loss of use of that property, other than property you own, use, rent, or lease. All such loss of use shall be deemed to occur at the time of the Accident that caused it; or

2. Loss of use of tangible property, other than property you own, use, rent, or lease, that is not otherwise damaged. All such loss shall be deemed to occur at the time of the Accident that caused it.

3. For purposes of this definition, tangible property does not include cash, checks, money orders or other financial instruments, or computer or electronic data of any kind.

W. "Property Damage Cleanup Sublimit" means the most we will pay for costs to clean up, remove or otherwise mitigate damage, debris, spilled cargo, or any other impediment or impairment to property not owned by an insured, which is caused by an Accident that is covered by this Policy.

X. "Retroactive Date" means any date expressly identified on the Declarations as the Retroactive Date. An expressly identified Retroactive Date shall be considered the Effective Date for determining the Policy Period. If no Retroactive Date is expressly identified on the Declarations, no coverage is provided for any period of time before the Effective Date.

Y. "Self-Insured Retention" or "SIR" means the amount set forth on the Declarations that the Insured will pay for each and every Claim for any combination of Damages and/or Claim Expenses otherwise covered under this Policy. The Insured will pay 100% of the Self-Insured Retention before any payment is due pursuant to the terms of this Policy.

Z. "Sub-limit" means a limited portion of the Limit of Liability under the Policy, identified for a specific Accident, person, or type or nature of Loss covered under this Policy. Sub-limits effective under the Policy are identified on the Declarations or in Endorsements attached to the Policy. All Sub-limits are expressly subject to and deplete any other applicable Sub-limit(s) and the Limit of Liability. Sub-limits are within, and not in addition to, the Limit of Liability. Both Sub-limits and the Limit of Liability are reduced by Claims Expenses. Specific Sub-limits are further defined as follows:

1. Any "Per Person" Sub-limit limits the portion of the Limit of Liability the Insurer may be obligated to pay as the result of Bodily Injury and/or Property Damage sustained by any person involved in an otherwise covered Accident to such person, together with all Damages claimed by other person(s) through, or as a result of, the Bodily Injury or Property Damage sustained by the person involved in the Accident, including but not limited to Claims for Loss of consortium or other Damages by immediate family members, relatives, or third parties.

2. Any "Per Accident" Sub-limit limits the portion of the Limit of Liability the Insurer may be obliged to pay as the result of Bodily Injury and/or Property Damage claimed by all persons as a result of an Accident. Any Per Accident Sub-limits are expressly subject to any applicable Per Person Sub-limits.

AA. "Suit" means any proceeding seeking recovery for Damages for Bodily Injury or Property Damage, including:

1. Any civil action filed in a court of law;

2. An arbitration proceeding to which you must submit or do submit with our consent; or

3. Any other alternative dispute resolution proceeding to which you submit with our consent.

## SECTION IX— REIMBURSEMENT

In the event we provide a defense for an Insured under the Policy and it is at any time determined that any Claim or theory of recovery for which a defense has been provided by us is not covered under the Policy, we expressly reserve the right to seek reimbursement of any Damages and/or Claim Expenses associated with any such Claim or theory of recovery from the Insured, including reimbursement on a prorate basis for that portion of any Claim or theory of recovery not covered if multiple Claims or theories of recovery have been asserted.

## SECTION X — SEVERABILITY

The provisions of this Agreement are severable. If any portion, provision, or part of this Agreement is held, determined, or adjudicated to be invalid, unenforceable, or void for any reason whatsoever, each such portion, provision, or part shall be severed from the remaining portions, provisions or parts of this Agreement and shall not affect the validity or enforceability of any remaining portions, provisions, or parts.

## SECTION XI — MUTUAL AFFIRMATION

Pursuant to the signature, facsimile or otherwise, appearing on the Application, quote, warranty form, Policy, or any other document provided to the Insurer to obtain insurance coverage, the parties affirm that all provisions serve to embody and articulate the entire agreement between the parties hereto, and that the parties unqualifiedly accept and agree to abide by the terms and conditions of the Policy.

## SECTION XII — GOVERNING LAW

This Agreement is entered into in the State of Utah and the Agreement, and any rights, remedies, or obligations provided for in this Agreement, shall be construed and enforced in accordance with the laws of Utah.

## SECTION XIII — U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL NOTICE TO CERTIFICATE HOLDERS

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under the United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

## SECTION XIV – CONSENT TO EXCLUSIVE JURISDICTION

The Insured understands and acknowledges that the Insurer conducts its business activities, including underwriting, risk management and claims services within the State of Utah. The Insured represents and acknowledges that the Insured has purposefully directed its actions to procure the insurance services of the Insurer within the State of Utah and, for that purpose, will make continuous and systematic requests for the Insurer's services in the State of Utah. The Insured acknowledges that, by entering into this policy of insurance, the Insured is deemed to be transacting business within the State of Utah such that the courts of Utah may exercise jurisdiction over it regarding any issues arising out of this Policy. In addition, the Insured hereby understands and consents to the jurisdiction of the courts in the State of Utah and agrees that those courts shall be the exclusive forum for the resolution of any claims or disputes arising between the parties related to any insurance coverage issues and any payments due the Insured under the Policy, unless both the Insurer and Insured agree otherwise in writing.

# SCHEDULED DRIVERS AMENDMENT ENDORSEMENT

## PCA-99-40

**This Endorsement changes the terms and conditions of the Policy issued. Please read it carefully!**

No Coverage shall be provided under this Policy for any covered Auto which is being used or operated by anyone other than the driver(s) or operator(s) on file with Southern General Agency, Inc. The Insured hereby warrants that each and every person on this policy is over the age of 25 and under the age of 70, unless such driver has been reviewed and authorized by an underwriter and additional premium, if applicable, has been paid for such drivers.

All other terms, conditions and exclusions of the Policy remain in full force and effect.

Exhibit 2

## PERSONAL GUARANTEE AND INDEMNITY AGREEMENT

### PAP-99-37

I, the undersigned, in my individual capacity, hereby enter into this Personal Guarantee and Indemnity Agreement ("Agreement") which is effective as of the date indicated below and which shall continue in force until such time as it is mutually cancelled with the written approval of the Insurer.

I hereby agree to personally indemnify and hold the Insurer harmless from any and all costs, attorneys fees, expenses, settlement proceeds, or other funds expended or deemed owing as a result of the following:

(1) Any failure by the Insured to pay all premiums, self-insured retentions and/or deductibles owed, including but not limited to the minimum earned premium due.

(2) Any claim involving a vehicle which was not properly scheduled on the Policy for which claim the Insurer is nevertheless required to make any payment as a result of any federal or state financial responsibility filing, including without limitation, any MCS-90, Form E or similar undertaking.

(3) Any claim involving a driver who was not properly scheduled on the Policy for which claim the Insurer is nevertheless required to make any payment as a result of any federal or state financial responsibility filing, including without limitation, any MCS-90, Form E or similar undertaking.

In addition, I hereby personally agree to pay all premiums, self-insured retentions and/or deductibles owed by the Insured, including but not limited to the minimum earned premium due, should the Insured fail to pay such premiums, self-insured retentions and/or deductibles by the date due and owing. I also hereby personally agree to pay all premiums, self-insured retentions and/or deductibles which should have been paid for an unscheduled driver and/or an unscheduled vehicle in the event one of the above-referenced types of claims is made.

The Insurer reserves the right to assess the full annual premium for any unscheduled vehicles and/or drivers. Such assessment is due and payable on the date of discovery. Unscheduled vehicles and/or drivers will be added to the Policy effective as of Policy inception or the discovery date, at the Insurer's discretion. Either way, premium will be due or my Policy will be cancelled. A 35-day notice of cancellation will be issued on the Policy and I am limited to the 35-day notice period to rectify a finding of unscheduled vehicles and/or drivers.

I acknowledge and agree that my obligations as set forth herein are not diminished or otherwise altered by a change in ownership or management of the insured entity, or by bankruptcy, dissolution, insolvency or any other change with respect to the insured entity.

All amounts payable by me under this Agreement shall be paid within 35-days of written notice provided to me by the Insurer. In the event such amounts are not paid within that time, I acknowledge and agree that I will be responsible for all collection costs, including reasonable attorneys fees.

Furthermore, I hereby elect to apply any and all unearned premium to unpaid balances of this Policy or any other policy I may hold or have held with the Insurer in the event this Policy is cancelled, whether by me or by the Insurer.

INSURED'S NAME _Bobirt R Miranda_

NAME OF OWNER: _Bobirt R Miranda_

OWNER'S SIGNATURE: _____, DATED: _02-06-19_

Subscribed and Signed before me

this: ____ day of _Feb_ , 20 ____                     A NOTARY OF _Tennessee_

(State or Location)

MY COMMISSION EXPIRES
AUGUST 22, 2022

_____ Notary Public

Insurance only works where risks are shared among similarly situated people and businesses. I know that the claims I submit will affect the risks that I am sharing with others. I also understand that my relationship with Prime Insurance Company depends on honesty. I trust that Prime Insurance Company will be honest with me and I promise to be honest with them. I know that it would be dishonest to submit an inflated insurance claim. I also know that it would be dishonest to exaggerate about the events surrounding the accident that resulted in an insurance claim. My integrity is important to me and I promise to maintain a high moral standard in my dealings with Prime Insurance Company.

OWNER'S SIGNATURE: _____, DATED: _02-06-19_

Exhibit 3

OMB No.: 2126-0008   **Expiration: 01/31/2020**

| **USDOT Number:** 3075412 | **Date Received:** |
|---|---|

A Federal Agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0008. Public reporting for this collection of information is estimated to be approximately 2 minutes per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, Washington, D.C. 20590.

 United States Department of Transportation
**Federal Motor Carrier Safety Administration**

### Endorsement for Motor Carrier Policies of Insurance for Public Liability under Sections 29 and 30 of the Motor Carrier Act of 1980

# FORM MCS-90

**Issued to** B & Y Transport LLC                    **of** Tennessee
*(Motor Carrier name)*                          *(Motor Carrier state or province)*

**Dated at** 1:15 pm    **on this** 7th    **day of** February    , 2019

**Amending Policy Number:** SC19020355          **Effective Date:** 02/08/2019

**Name of Insurance Company:** Prime Insurance Company

**Countersigned by:** *Stephen A Viehe*
*(authorized company representative)*

The policy to which this endorsement is attached provides primary or excess insurance, as indicated for the limits shown *(check only one)*:

- ⊙ *This insurance is primary and the company shall not be liable for amounts in excess of $* 750,000.00 *for each accident.*
- ○ *This insurance is excess and the company shall not be liable for amounts in excess of $* _____ *for each accident in excess of the underlying limit of $* _____ *for each accident.*

Whenever required by the Federal Motor Carrier Safety Administration (FMCSA), the company agrees to furnish the FMCSA a duplicate of said policy and all its endorsements. The company also agrees, upon telephone request by an authorized representative of the FMCSA, to verify that the policy is in force as of a particular date. The telephone number to call is: 800-257-5590 .

Cancellation of this endorsement may be effected by the company of the insured by giving (1) thirty-five (35) days notice in writing to the other party (said 35 days notice to commence from the date the notice is mailed, proof of mailing shall be sufficient proof of notice), and (2) if the insured is subject to the FMCSA's registration requirements under 49 U.S.C. 13901, by providing thirty (30) days notice to the FMCSA (said 30 days notice to commence from the date the notice is received by the FMCSA at its office in Washington, DC).

| **Filings must be transmitted online via the Internet at http://www.fmcsa.dot.gov/urs.** |
|---|

*(continued on next page)*

# DEFINITIONS AS USED IN THIS ENDORSEMENT

*Accident* includes continuous or repeated exposure to conditions or which results in bodily injury, property damage, or environmental damage which the insured neither expected nor intended.

*Motor Vehicle* means a land vehicle, machine, truck, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway for transporting property, or any combination thereof.

*Bodily Injury* means injury to the body, sickness, or disease to any person, including death resulting from any of these.

*Property Damage* means damage to or loss of use of tangible property.

*Environmental Restoration* means restitution for the loss, damage, or destruction of natural resources arising out of the accidental discharge, dispersal, release or escape into or upon the land, atmosphere, watercourse, or body of water, of any commodity transported by a motor carrier. This shall include the cost of removal and the cost of necessary measures taken to minimize or mitigate damage to human health, the natural environment, fish, shellfish, and wildlife.

*Public Liability* means liability for bodily injury, property damage, and environmental restoration.

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon,

or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

The limits of the company's liability for the amounts prescribed in this endorsement apply separately to each accident and any payment under the policy because of anyone accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

*(continued on next page)*

Exhibit 4



A PREMIER BUSINESS & LITIGATION LAW FIRM

SANDY OFFICE
9350 SOUTH 150 EAST, SUITE 820
SANDY, UTAH 84070
T: (801) 532-7080
F: (801) 596-1508
WWW.STRONGANDHANNI.COM

ANDREW D. WRIGHT
Direct Line: (801) 323-2055
AWRIGHT@STRONGANDHANNI.COM

July 29, 2019

B & Y Transport LLC
1512 Waxman Drive
La Vergne, TN 37086

  RE: Claimant: Jose Luis Rodriguez Gutierrez
     Date of Loss: May 4, 2019
     Claim No.: SC190203550019

Dear Insured:

  I have been asked by Prime Property Insurance Company ("Prime") to address this letter to you with regard to issues of insurance coverage in the above-referenced matter. Upon investigation, my client has determined that there are certain issues that impact coverage for this claim. The purpose of this letter is to inform you of those issues. **Please understand that Prime believes there is no coverage available under the express terms of the Policy. Nevertheless, because the MCS-90 Endorsement applies, unless you direct otherwise, Prime will resolve the third party claims and then seek reimbursement from your company.**

## I. FACTUAL BACKGROUND:

  This claim arises from an accident that occurred on May 4, 2019. On that date, an apparent employee of B & Y Transport, LLC ("B & Y Transport"), Ariel Hernandez Cordova, was driving a 2012 International Tractor, VIN -13536 pulling a 53-foot trailer when the vehicle blew a tire. Mr. Cordova then braked, lost control and veered to the right impacted another vehicle driven by Jose Luis Rodriguez Gutierrez. Mr. Cordova did not take a drug or alcohol test after the accident, claiming he did not know he needed to. Mr. Gutierrez, who has obtained counsel, claims personal injuries and a totaled vehicle. There is also an environmental cleanup claim being asserted by Incident Management Solutions, LLC due to leaked diesel.

## II. THE POLICY:

  Prime issued commercial auto and cargo coverage to B & Y Transport in the form of Policy No. SC19020355 with coverage effective dates of February 8, 2019 through February 8, 2020 (the "Policy"). The Policy contains the following provisions that relate to coverage in this case.

First, it sets forth the following relevant requirements with regard to coverage of a claim.

## COMMERCIAL BUSINESS AUTO INSURANCE POLICY
### PCA-00-08

**THIS COMMERCIAL BUSINESS AUTO INSURANCE POLICY (the "Policy") is a manuscript policy, meaning it is a negotiated agreement between the Named Insured and the Insurer, and as such it may differ significantly from liability policies offered by other insurance companies. This Policy contains very strict claim reporting requirements which must be followed as conditions precedent to coverage. The terms of this Policy are contractual and are not merely recitals and all information supplied by any Insured to obtain coverage, constitute warranties of the Insured to the Insurer.**

**Coverage is strictly limited to scheduled Autos operated by scheduled drivers and operations and at those locations listed, described, and defined herein. Various other provisions of this Policy restrict and limit the coverage provided. Please read the entire Policy and all the Endorsements carefully to determine your rights and duties and what is and is not covered.**

(Policy, PCA-00-08, p. 1) (bold in the original).

Next, the Policy includes the following additional information pertaining to coverage

## SECTION I — LIABILITY COVERAGE

A. Insuring Agreement

1. Subject to all of the terms, limitations, conditions, definitions, exclusions, and other provisions of this Policy, we will pay Damages in excess of any SIR that you are legally obligated to pay because of Bodily Injury or Property Damage to which this Policy applies if caused by an Accident and resulting from the ownership, maintenance, or use of a Scheduled Auto as identified in the Policy, on the Declarations or any Endorsement if:

   . . . .

   d. The Scheduled Auto is being operated by a Scheduled Driver at the time of the Accident.

(Policy, PCA-00-08, p. 1).

Next, the Policy contains the following relevant exclusion

B. Liability Exclusions

In the event that any of the exclusions stated in this Policy are found by a court of law to be unenforceable or in contradiction to applicable law in regards to a specific Claim, the invalid provision is to be interpreted as providing the minimum insurance coverage required under the financial responsibilities laws, laws, in place of the invalid exclusion, for such Claim.

This Policy does not cover, and we will not be obligated to defend you against or pay Damages on your behalf for any of the following:

. . . .

15. Bodily Injury or Property Damage arising out of the use, operation, or maintenance of a Scheduled Auto by anyone other than an Insured.

. . . .

18. Any Claim related to, caused by, or arising from Pollution. This exclusion applies to any Pollution arising out of the actual, alleged, or threatened spilling, discharge, dispersal, seepage, migration, release, or escape of Pollutants at any time, including without limitation, the following:

. . . .

e. Pollution arising out of any fuel or other fluids from any Covered Auto, including without limitation, any turn, collision, damage, mechanical defect or leakage, or during work performed on any such vehicle.

f. Any Loss, Claim, cost, or expense arising out of any:

(1) Request, demand, or order (including consent decrees, consent orders, or administrative procedures) that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of Pollutants; or

(2) Claim or Suit by or on behalf of a governmental authority seeking recovery for testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of Pollutants.

Clean up costs incurred by or on behalf of any insured for fuel spills from any Covered Auto are not covered by this Policy.

(Policy, PCA-00-08, pp. 2, 5-6).

Next, the Policy includes the following information pertaining to who qualifies as an insured.

## SECTION III — WHO IS AN INSURED?

. . .

B. An "Insured" is also any Scheduled Driver of an otherwise Scheduled Auto who is maintaining or operating the Scheduled Auto for commercial business operations.

(Policy, PCA-00-08, p. 11).

Next, the following Scheduled Drivers Amendment Endorsement was issued with the Policy.

## SCHEDULED DRIVERS AMENDMENT ENDORSEMENT

### PCA-99-40

**This Endorsement changes the terms and conditions of the Policy issued. Please read it carefully!**

No Coverage shall be provided under this Policy for any covered Auto which is being used or operated by anyone other than the driver(s) or operator(s) on file with Southern General Agency, Inc. The Insured hereby warrants that each and every person on this policy is over the age of 25 and under the age of 70, unless such driver has been reviewed and authorized by an underwriter and additional premium, if applicable, has been paid for such drivers.

All other terms, conditions and exclusions of the Policy remain in full force and effect.

(Endorsement, PCA-99-40, p. 1).

Additionally, the Policy was issued with the following Pollution Liability Endorsement.

## POLLUTION LIABILITY COVERAGE FOR SCHEDULED AUTOS

### PCA-99-17

**This Endorsement changes the terms and conditions of the Policy issued. Please read it carefully!**

The Policy is hereby amended as follows:

Section I. Liability Coverage subsection (B)(18) applies to liability assumed under a written contract or agreement.

Subject to all of the terms and conditions of the Policy, we will pay Damages caused by an Accident and resulting in Covered Pollution Cost or Expense and arising from the ownership, maintenance, or use of a covered Auto as identified in Section III or any Endorsement.

For purposes of this Endorsement, Covered Pollution Cost or Expense means any cost or expense arising out of:

1. Any request, demand or order by a governmental authority that any Insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of Pollutants; or

2. Any Claim or Suit by or on behalf of a governmental authority for Damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding, or assessing the effects of Pollutants.

Covered Pollution Cost or Expense does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of Pollutants:

a. Before the Pollutants or any property in which the Pollutants are contained are moved from the place where they are accepted by the Insured for movement into or onto the covered Auto; or

b. After the Pollutants or any property in which the pollutants are contained are moved from the covered Auto to the place where they are finally delivered, disposed of or abandoned by the Insured.

Paragraph a. and b. above do not apply to Accidents that occur away from premises owned by or rented to an Insured with respect to Pollutants not in or upon a covered Auto if:

(i) The Pollutants or any property in which the Pollutants are contained are upset, overturned or damaged as a result of the maintenance or use of a covered Auto; and

(ii) The discharge, dispersal, seepage, migration, release or escape of the Pollutants is caused directly by such upset, overturn or damage.

(Endorsement, PCA-99-17, p.1).

Finally, in addition to the Policy, Prime filed an MCS-90 Endorsement with respect to B & Y Transport's qualifying operations. That endorsement provides, in relevant part, as follows:

## MCS-90 ENDORSEMENT

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance is afforded, for public liability, does not apply to injury or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

(MCS-90 Endorsement, p. 2).

## III. DENIAL OF COVERAGE / RESERVATION OF RIGHTS:

The Policy requires all disputes relating to coverage be determined in accordance with Utah law by a court within the State of Utah. Under Utah law, insurance policy language is construed pursuant to its ordinary meaning. *See S.W. Energy Corp. v. Continental Ins. Co.*, 974 P.2d 1239,

1242 (Utah 1999); *Alf v. State Farm Fire & Cas. Co.,* 850 P.2d 1272, 1274 (Utah 1993); *Nielsen v. O'Reilly,* 848 P.2d 664, 665 (Utah 1992). Based on the foregoing, there is no coverage under the Policy for claims arising out of the May 4, 2019 incident.

A.  **There is no coverage under the Policy because the May 4, 2019 incident involved an unscheduled driver.**

As set forth above, there is no coverage under the Policy for claims *"arising out of the use, operation, or maintenance of a Scheduled Auto by anyone other than an Insured."* The Policy defines "Insured" as a *"Scheduled Driver of an otherwise Scheduled Auto."* Mr. Cordova was not a scheduled driver, on file with Southern General Agency, Inc., as required by the Scheduled Drivers Amendment Endorsement. In fact, it is Prime's understanding that B & Y Transport requested to add Mr. Cordova to the Policy. Following that request, Prime issued a quote to add Mr. Cordova to the file on February 18, 2019. However, the premium was never paid and therefore, Mr. Cordova was never added to the Policy or placed on file with Southern General as a scheduled driver. As a result of Mr. Cordova's unscheduled driver status, there is no coverage under the Policy for claims arising out of the May 4, 2019 incident. Separate and apart from the reservations set forth above, Prime reserves all rights under all applicable laws and under the Policy, including but not limited to the right to recoup any costs, charges and/or expenses which it may incur with respect to this claim and/or to initiate declaratory judgment proceedings to resolve any coverage issues.

B.  **There is no coverage under the Pollution Endorsement for the cleanup costs associated with the May 4, 2019 accident the based-on Mr. Cordova's unscheduled driver status**

As set forth above, the insuring language of the Policy explicitly states "[c]overage is strictly limited to scheduled Autos operated by scheduled drivers and at those locations listed, described, and defined herein." Therefore, despite the Pollution Endorsement issued with the Policy, which would traditionally provide coverage for the cleanup cost in this matter, there is there is no coverage for the pollution cleanup associated with the May 4, 2019 accident due to Mr. Cordova's unscheduled status. Separate and apart from the reservations set forth above, Prime reserves all rights under all applicable laws and under the Policy, including but not limited to the right to deny coverage on this basis, to recoup any costs, charges and/or expenses which it may incur with respect to this claim and/or to initiate declaratory judgment proceedings to resolve any coverage issues.

C.  **To the extent Prime is required to make payments pursuant to the MCS-90 Endorsement, despite the coverage issues discussed herein, B & Y Transport would be obligated to reimburse Prime for any payments made to satisfy this claim.**

As set forth above, the MCS-90 Endorsement states the terms and conditions of the Policy remain effective as between the insurer and the insured and *"[t]he insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not*

*have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement."* Additionally, as the owner of B & Y Transport, Robert Miranda signed a Personal Guarantee and Indemnity Agreement in which he agreed to indemnify and hold Prime harmless for any claim involving a driver and/or auto that was not properly scheduled on the Policy. Accordingly, as the extent the MCS-90 applies to this matter and Prime is obligated to make indemnity payments for claims arising out of the May 4, 2019 incident despite the coverage issues set forth above, B & Y Transport is obligated to reimburse Prime for all payments made to satisfy this claim. Prime reserves the right to seek reimbursement from B & Y Transport for any payment made in conjunction with providing indemnification in this matter.

**Unless you direct otherwise, Prime will move ahead with resolution of the third party claims for bodily injury, property damage and environmental cleanup, and will then seek reimbursement from your company. Please advise immediately if you would like these claims handled differently.**

## IV. CONCLUSION:

As outlined above, there are issues that preclude coverage under the terms of the Policy for claims arising out of the May 4, 2019 incident. First, there is no coverage under the Policy because the subject incident involved an unscheduled driver. Second, there is no coverage for the pollution cleanup resulting from the May 4, 2019 accident. Third, to the extent Prime is required to make payments pursuant to the MCS-90 Endorsement, despite the coverage issues discussed herein, B & Y Transport would be obligated to reimburse Prime for any payments made to satisfy this claim.

In light of the foregoing, Prime hereby reserves all rights under all applicable law and under the Policy, including but not limited to the right to recoup any costs, charges and/or expenses which it may incur with respect to this claim and/or to initiate declaratory judgment proceedings to resolve any coverage issues. It also reserves the right to deny coverage on any grounds in addition to those set forth above. Nothing in this letter should be construed as a waiver, estoppel, or forfeiture of any right or defense that Prime may have under the Policy, any regulation, or law, or otherwise.

Additionally, if any other claims relating to the May 4, 2019 incident should arise, Prime reserves its right to review coverage on any further claim(s). Please inform me in the event a complaint is filed and/or revised claims are made against B & Y Transport or Mr. Cordova. My client will continue to investigate and handle this matter, subject to the above reservations.

Finally, if you have any additional information about the May 4, 2019 incident, or the Policy, or if you believe the facts and conclusions stated above are in error in any way, please forward that information to me at your earliest convenience. I would be happy to discuss the above issues with you in greater detail.

Very truly yours,

STRONG & HANNI

By _Andrew D. Wright_

Andrew D. Wright

cc:     Prime Insurance Company (via email)



STRONG & HANNI
LAW FIRM

A PREMIER BUSINESS & LITIGATION LAW FIRM

SANDY OFFICE

9350 SOUTH 150 EAST, SUITE 820
SANDY, UT 84070

T : (801) 532-7080
F : (801) 596-1508

WWW.STRONGANDHANNI.COM

HENRY E. HEATH
PHILIP R. FISHLER
ROGER H. BULLOCK
PAUL M. BELNAP
STUART H. SCHULTZ
MARK S. SWAN
BRIAN C. JOHNSON ²
STEPHEN J. TRAYNER
STANFORD P. FITTS ¹⁶
BRADLEY W. BOWEN
PETER H CHRISTENSEN ¹¹ ¹⁶
ROBERT L. JANICKI ⁵
REID W. LAMBERT
H. BURT RINGWOOD
ELIZABETH R. LOVERIDGE ¹⁵
ZACHARY T. SHIELDS
KRISTIN A. VANORMAN
KENT M. BROWN ¹
PETER H. BARLOW ¹
MICHAEL L. FORD ¹ ¹² ¹⁶
GRADEN P. JACKSON ³
H. SCOTT JACOBSON

MICHAEL J. MILLER ⁶ ¹⁴
ANDREW D. WRIGHT
BYRON G. MARTIN ¹ ¹
BENJAMIN P. THOMAS
LANCE H. LOCKE
MICHAEL D. STANGER ⁸
A. JOSEPH SANO
JAMES C. THOMPSON
KARMEN C. SCHMID ² ¹¹
LORI A. JACKSON
WILLIAM B. INGRAM
RYAN P. ATKINSON ¹⁶
JENNIFER R. CARRIZAL
JOHN M. ZIDOW
ANDREW B. McDANIEL
SADÉ A. TURNER ¹
CASEY W. JONES
RYAN C. BULLOCK
MICHAEL A. STAHLER ¹⁰ ¹³
NICHOLAS A. BENDER ¹
KATHLEEN J. ABKE ⁸
MARSHALL J. HENDRICKSON

CHET W. NEILSON ¹
S. SPENCER BROWN
KATHRYN T. SMITH ¹⁶
RON W. HAYCOCK, JR.
MATTHEW A. JONES ⁹
JOSEPH SHAPIRO ²
ANDREW D. DAY
MATT W. HARRISON
NICHOLAS E. DUDOICH
ALAN R. HOUSTON
JASON L. DEFOREST
JESSICA J. JOHNSTON
AXEL TRUMBO
SCARLET R. SMITH
IAN L. QUIEL
STEVEN M EDMONDS ¹⁴
JACK DAVID SMART
R. JESSE DAVIS
NICHOLAS R. REMKES ⁷
KAILEEN M. BALZANO ¹⁷
AARON H. SMITH ¹⁰
SPENCER W. YOUNG

1 ALSO MEMBER ARIZONA BAR
2 ALSO MEMBER CALIFORNIA BAR
3 ALSO MEMBER COLORADO BAR
4 ALSO MEMBER DISTRICT OF COLUMBIA BAR
5 ALSO MEMBER IDAHO BAR
6 ALSO MEMBER MONTANA BAR
7 ALSO MEMBER NEBRASKA BAR
8 ALSO MEMBER NEVADA BAR
9 ALSO MEMBER NEW MEXICO BAR
10 ALSO MEMBER NEW YORK BAR
11 ALSO MEMBER OREGON BAR
12 ALSO MEMBER VIRGINIA BAR
13 ALSO MEMBER VERMONT BAR
14 ALSO MEMBER WASHINGTON BAR
15 ALSO MEMBER WISCONSIN BAR
16 ALSO MEMBER WYOMING BAR
17 ALSO MEMBER NEW YORK BAR ONLY

OF COUNSEL
---------------
PAUL W. HESS
MARK H. HOWARD
DAVID K. REDD
---------------
GORDON R. STRONG (1909-1965)
GLENN C. HANNI (1923-2015)

ESTABLISHED 1888

September 19, 2019

Gabriel M. Sanchez
The Sanchez Law Group
7245 S.W. 87ᵗʰ Avenue, Suite 400
Miami, Florida 33173

RE:     Claimant:     Jose Luis Rodriguez Gutierrez
        Date of Loss:  May 4, 2019
        Claim No.:     SC190203550019

Dear Ms. Sanchez:

Prime Insurance Company ("Prime") has asked me to address this letter to you with respect to issues of insurance coverage in the above-referenced matter. Prime is in receipt of your letter of September 4, 2019, in which you tendered a claim for reimbursement of storage, removal and cleanup costs arising out of the above accident to Prime. In a letter dated July 29, 2019, I informed B & Y Transport LLC of certain issues impacting coverage for the claims arising out of the May 4, 2019 accident. I have enclosed a copy of that letter for your reference.

As set forth in that letter, there is no coverage under the terms of the Policy inasmuch as the May 4, 2019 accident involved a driver, Ariel Hernandez Cordova, who was not scheduled under the Policy as required. However, inasmuch as an MCS-90 Endorsement was issued in conjunction with the Policy, Prime has agreed to defend and indemnify B & Y Transport against the third-party claims arising out of that accident, but intends to seek reimbursement against B & Y Transport for the amounts it expends in doing the same.

Prime was not aware of the towing, storage and hazmat cleanup costs being presented by Johnson's Wrecker Service at the time of my July 29, 2019 letter. However, that claim would likewise be precluded under the terms of the Policy for the same reasons set forth above. Although that claim may also fall under the MCS-90 Endorsement, Prime would have likewise been entitled to reimbursement from B & Y Transport had it paid that claim on behalf of B & Y Transport, and would also potentially be entitled to recover any costs it incurred in collecting such reimbursement.



SALT LAKE OFFICE — 102 SOUTH 200 EAST, SUITE 800, SALT LAKE CITY, UTAH 84111
SANDY OFFICE — 9350 SOUTH 150 EAST, SUITE 820, SANDY, UTAH 84070

Accordingly, it is in both of our clients' interests that B & Y Transport pay that claim directly, as it has already done.

Please be aware that Prime continues to reserve all rights under the law and under the Policy, including but not limited to the right to revisit its coverage determination. Therefore, if B & Y Transport has any additional information it would like my client to consider with respect to the coverage issues in this case, please forward that information to me at your earliest convenience. Nothing in this letter should be construed as a waiver, estoppel, or forfeiture of any right or defense that Prime may have under the Policy, any regulation, or law, or otherwise.

Please feel free to contact me should you have any questions or concerns regarding the above.

Very truly yours,

STRONG & HANNI

By _Andrew D. Wright_
   Andrew D. Wright

Encl.

cc:    Prime Insurance Company (via email)